RETAIL, WHOLESALE, DEPARTMENT STORE UNION, AFL–CIO–CLC, Alvin E. Heaps as President thereof, and Lenore Miller, as Temporary Trustees of National Union of Hospital and Health Care Employees, Plaintiffs,

v.

NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, a DIVISION OF RWDSU, Henry Nicholas as President thereof and Jerome Brown, as Secretary-Treasurer thereof, Defendants.

No. 83 CIV 8631 (LBS).

United States District Court, S.D. New York.

Rendered Orally. Dec. 2, 1983.

Amended and Filed Jan. 9, 1984.

Markewich, Friedman & Markewich, New York City, for plaintiffs; Daniel Markewich, Jon Quint, New York City, of counsel.

Greenberg, Margolies, Ziegler & Schwartz, Roseland, N.J., Eisner & Levy, P.C., New York City, for all defendants except Jerome Brown; Martin Greenberg, Roseland, N.J., Eugene G. Eisner, Richard A. Levy, New York City, of counsel.

Coughlin, Creane, Malone & Milner, Milford, Conn., for defendant Jerome Brown; John M. Creane, Milford, Conn., of counsel.

OPINION

SAND, District Judge.

This matter [*] was brought on by an order to show cause filed November 29, 1983. The plaintiffs Retail, Wholesale, Department Store Union ("RWDSU" or "International Union"), Alvin E. Heaps, as president thereof, and Lenore Miller, seek preliminary and permanent equitable relief to enforce a trusteeship imposed upon the defendant, the National Union of Hospital and Health Care Employees ("the National Union"). The National Union has cross moved to enjoin the plaintiffs from taking any further steps to implement the trustee-

---

[*] This opinion was initially rendered in open court on December 2, 1983 and has undergone some minor editing and revision.

ship in question. By agreement of the parties, a hearing on the motions for preliminary injunctions and the trial on the merits have been consolidated. The trial has been held over the past two days.

### Findings of Fact

The plaintiff Retail, Wholesale, Department Store Union is an international labor union of approximately 250,000 members. Plaintiff Alvin Heaps is the president and plaintiff Lenore Miller is the secretary-treasurer of the plaintiff union. The defendant National Union of Hospital and Health Care Employees is a division of the plaintiff with a membership of approximately 128,000 members. Defendant Henry Nicholas is the president and defendant Jerome Brown is the secretary-treasurer of the defendant union.

On November 29, 1983, the president of the International Union, plaintiff Alvin Heaps, issued a letter appointing plaintiff Lenore Miller temporary trustee of the defendant union. The letter recited that the basis for this action was

"for the purposes of preventing and correcting financial malpractice and otherwise carrying out the legitimate objectives and protecting the interests of this International Union and the said National Union, and assuring compliance with the provisions of the International Union's Constitution and the Constitution and bylaws of the said National Union."

Mrs. Miller attempted to occupy the offices of the National Union in accordance with the appointment by President Heaps. However, she was refused admittance to the offices of the defendant and was otherwise prevented from assuming her office as temporary trustee.

The purported financial malpractice engaged in by the National Union, as seen by the plaintiffs, relates primarily to the manner in which its Strike and Defense Fund has been administered. In essence, the plaintiffs have alleged that whereas the reported net assets of the National Union's Strike and Defense Fund were $10,620,461, only $5,592,105 was available in cash assets. The difference between these two figures is attributable to the fact that the National Union had advanced money from the Strike and Defense Fund to itself and to several other divisions of the union.

Plaintiffs have also questioned the practice of the defendant in charging the Strike and Defense Fund a 10 percent administrative fee and the refusal of representatives of the National to attend a meeting called by President Heaps.

There is no contention made by the plaintiffs in this case that they have any reason to believe that any funds that came into the possession and control of the National have been used for other than union purposes. Rather, the disagreement between the parties relates to the specific union purposes for which the Strike and Defense Fund can be used consistent with the law and the union's own internal regulations. If the Strike and Defense Fund is, as plaintiff contends, in the nature of a trust which can be utilized only for purposes of strike benefits, and which does not otherwise constitute an asset of the National, then the claim of the plaintiffs that the National has engaged in improper financial practices has credence. If, on the other hand, the Strike and Defense Fund is no more than another asset of the National, which it has chosen to identify by that name, but the use of which is subject to no legal prohibitions or restraints other than those determined by the authorized executive board members of the National, then this purported financial malpractice of the National did not occur.

Fundamental to the resolution of this question are the facts and circumstances relating to the creation and management of the Strike and Defense Fund. It appears that the Strike and Defense Fund was created by the defendants' predecessor union sometime in 1969 pursuant to a resolution of the board, the minutes of which are not available. An account was opened and is still maintained at Amalgamated Bank. The resolution opening this account is the standard printed form of that banking institution. It begins "I, Doris Turner, hereby certify that I am secretary and the

official custodian of the records of National Union Strike and Defense Fund, an unincorporated association," and then recites that the account is opened pursuant to the meetings of the members of the executive board.

There exists no trust instrument or other document which defines the nature of this fund or which imposes any restrictions on its use. The Constitution of the National provides in Article 7, Section 3: "10 percent of all the dues collected shall be set aside by the National Union for a Strike and Defense Fund." Article 15, Section 4, provides: "All requests for benefits from the National Union Strike and Defense Fund shall be made in the first instance to the president of the National Union, who may appoint a standing committee of the National Executive board to act upon such requests." Such a committee was in fact created, the function of which was to pass upon requests for strike benefits.

The evidence indicates that it has been the practice of the National and its executive committee to permit moneys to be advanced from the Strike and Defense Fund to the National Union and to other divisions. The practice of the National through the year 1981 had been to report separately the receipts and disbursements of the Strike and Defense Fund, and advances from the Strike and Defense Fund to divisions and to the National Union were characterized as loans, a term which the defendants' accountant candidly acknowledged is a term which connotes a transaction between two different entities.

Some of the misunderstanding and confusion which surrounds this controversy results from the fact that for the last year, in addition to those financial statements which have previously been prepared, the National had prepared a consolidated financial statement which combined the Strike and Defense Fund with the other assets of the National Union. Of course, as the result of consolidation, the "loan" from the Strike and Defense Fund to the National was eliminated, since as a matter of standard accounting practice, transactions be-

tween the consolidated entities would no longer be shown on their consolidated financial statement.

In all prior years, however, the "loans" from the Strike and Defense Fund to the union were clearly listed as such on the financial reports that were printed annually in the National Union's newspaper and distributed to all its members. In addition, information as to the Strike Fund's available cash assets was at all times, including the most recent years, published and made available to the union membership in the same annual reports. The plaintiffs, however, contend that they did not become aware of the challenged practices until late October of 1983.

## Conclusions of Law

It should be very clear that this Court is not called upon to determine whether the practice of utilizing funds placed in a segregated account entitled "Strike and Defense Fund" for other union purposes constitutes sound trade unionism or wise policy. That is not the issue to be determined by a federal court in these proceedings. Those matters rest with the elected union officials in the first instance and ultimately with the membership of the union who elect them. Rather, the issues before this Court are, first, whether the National Union exceeded its *legal* authority in the management of the Strike and Defense Fund, and, second, the propriety, as a matter of law, of the imposition by the plaintiff of a temporary trusteeship on the defendant without notice or a prior hearing.

In the absence of any trust documents or resolutions creating a trust fund or imposing other restraints on its use, the plaintiffs are compelled to rely on the historical treatment by the National of this fund, and on the fact that the National saw fit to report the fund as a separate fund and transactions between it and the National as being loans. The latter fact does not conclusively establish that the Strike and Defense Fund was legally separate from the rest of the union's assets. Defendant Henry Nicholas, President of the National, tes-

tified that the reason for this practice was better to assure a repayment of the fund; that in order to impose fiscal restraint and discipline these advances were treated as loans which had to be repaid rather than as grants.

■ However, even if we accept arguendo the proposition that the practices of the National establish the existence of a trust, one must look to these same practices in determining what the terms of the trust would be. The practice since the fund's inception has been to cause the fund to advance moneys to the National and to the divisions and to pay the ten percent administrative fee to the National.

Plaintiffs contend, however, that even if these past practices establish the legally permissible uses of the Strike and Defense Fund, the magnitude of the loans in the last two years is qualitatively different than in the past, thereby creating a situation in which the relevant provisions of the Constitution authorize a temporary trusteeship. However, in considering the size of the loans, one also has to consider the size of the membership of the union, the dues of which constitute a source of income to the National, and all of the facts and circumstances surrounding the operation of the loan. Taking all these considerations into account, we do not believe that the practice of the National has changed so radically as to warrant a finding that the National has exceeded the legally permissible uses of the Strike and Defense Fund.

We now turn to the second legal question before us, the propriety of the imposition of a temporary trusteeship on the National Union.

Under the Labor-Management and Disclosure Act, 29 U.S.C. § 462, a temporary trusteeship can be imposed only in accordance with the Constitution and bylaws of the organization which has assumed trusteeship over the subordinate body, and only for certain limited purposes: "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, re-storing democratic procedures, or otherwise carrying out the legitimate objects of such labor organizations."

Article 23, Section 5 of the RDWSU's Constitution allows the president to institute a temporary trusteeship over a subsidiary union without a hearing when the president has "reason to believe that an emergency situation exists." In short, in order for the trusteeship here to have been properly imposed, it must have arisen from a good-faith belief on the part of the plaintiffs of the need to address an emergency financial situation.

■ The Second Circuit has held that a parent labor union, "is entitled to a preliminary injunction imposing a trusteeship on application unless the local comes forward with adequate proof that the trusteeship is not being sought in good faith." *National Association of Letter Carriers v. Sombrotto*, 449 F.2d 915, 921 (2d Cir.1971). In a consolidated hearing in which a preliminary injunction and the trial on the merits are being heard together, burdens of proof may be somewhat different; but even assuming, however, that the defendants have the burden of demonstrating a lack of good faith on the part of the plaintiffs, we believe that the burden has been satisfied and that the actions of the plaintiffs in appointing Lenore Miller as a temporary trustee have not been taken in good faith.

It is the contention of the plaintiffs that they first became aware of the practice of the National in permitting loans to be made from the Strike and Defense Fund at the end of October 1983. We find that, if in fact the plaintiffs did not know of this practice until the end of October 1983, they should have known of this practice, since there was no effort to conceal it, and indeed, the financial statements reflecting these loans were printed in the National newspaper distributed to all its members.

Furthermore, Doris Turner, an officer in both the National and International unions who testified on behalf of the plaintiffs, was present at meetings of the National Union in February 1983 and in October

1982, the minutes of which reflect an extended discussion of the question of loans from the Strike and Defense Fund, and the repayment thereof. Indeed, there has been introduced in evidence a check signed by Mrs. Turner drawn on the account of the Strike and Defense Fund, apparently advancing a loan to the Ardeon Realty Company, a wholly owned subsidiary of the National, utilized as the vehicle for the ownership of the headquarters building. Thus, if Mrs. Turner, as an officer of the plaintiff's union, did not have actual knowledge that the loans were being made from the Strike and Defense Fund (and not, as she testified she believed, from general funds of the National) she clearly had at least constructive knowledge that this was the case.

Even assuming, however, that the plaintiff's were not previously chargeable with knowledge of the financial practices of which they now complain, the temporary trusteeship was improperly imposed, because it was not created to correct an "emergency" financial condition. The term "emergency" used by the RWDSU in its Constitution, connotes a situation "developing suddenly and unexpectedly and demanding immediate action." *American Heritage Dictionary* (New College Edition, 1976). A financial procedure that has been practiced for ten years and that has been fully disclosed during that period obviously cannot be described in those terms. It is not a sufficient ground for asserting an "emergency," which has connotations of being sudden and unexpected, that the plaintiff's awareness of that which was not being concealed, and indeed was being published and distributed, occurred suddenly or unexpectedly.

In many respects this case resembles *International Union, Allied Industrial Workers of America v. Local 589*, 693 F.2d 666, (7th Cir.1982). There, the Seventh Circuit dissolved a trusteeship imposed by a parent union upon one of its subsidiary locals because the parent had acquiesced for several years in the practice which it suddenly sought to invoke as the basis for the imposition of a trusteeship. As the court noted in that case, "Equity aids only the vigilant, and injunctive relief will be denied to those who slumber upon their rights." 693 F.2d at 674.

We also do not believe that the failure of the leadership of the National Union to attend a meeting called by President Heaps of the RWDSU constitutes an adequate basis for the imposition of a trusteeship. It is not for this court to comment on the manner in which that meeting was called with virtually no advance notice or disclosure to the President of the National except to find that the response of the National under all the circumstances does not fall within that category of events or circumstances as would, under the provisions of the International's Constitution, constitute an adequate basis for the action taken.

One final aspect of this case deserves comment. The events giving rise to this lawsuit must be seen against a background of serious policy disputes and general acrimony between the two unions. Lenore Miller was named a Temporary Trustee only eight days prior to the convention of National Union, held every two years. Part of this Court's finding of a lack of good faith is the almost irresistible inference that this trusteeship was intended to influence the proceedings and outcome of that convention and generally to effect policy decisions more properly left to the democratic vote of the union membership.

Accordingly, for the reasons stated, the plaintiff's prayer for equitable relief is denied. The defendant seeks by way of cross motion a preliminary injunction to stay the plaintiffs, "from taking any further steps to impose a trusteeship upon the National Union or to interfere in the autonomous management of the National Union." The defendants have not shown any action on the part of the plaintiffs, other than the attempted imposition of the temporary trusteeship, which would give rise to a need for affirmative injunctive relief. Accordingly, the defendants' cross motion for a preliminary injunction is denied without prejudice to a renewal should there be any

conduct on the part of the plaintiffs which constitutes a basis for such an application or is in any way inconsistent with the Court's ruling.

SO ORDERED.