753 F.2d 223
 118 L.R.R.M. (BNA) 2451, 102 Lab.Cas. P 11,322
 Michael COTTER, Appellant,
v.
Francis R. OWENS, individually and as Business Manager of
Local 1-2, Utility Workers Union of America, and
Local 1-2, Utility Workers Union of
America, Appellees.
 No. 369, Docket 84-7574.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1984.
Decided Jan. 15, 1985.
 
 Arthur Z. Schwartz, New York City (Clifton & Schwartz, New York City, of counsel), for Appellant.
 David Stolow, New York City (Menagh, Trainor & Bochner, New York City, of counsel), for Appellees.
 Before FEINBERG, Chief Judge, TIMBERS and MESKILL, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 Michael Cotter appeals from a judgment for defendants in the United States District Court for the Southern District of New York on his complaint against Local 1-2, Utility Workers Union of America (the Local), and Francis R. Owens, the prior Business Manager of the Local and present Executive Vice President of the national union. Cotter brought suit under Section 102 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Sec. 401 et seq., alleging that defendants had violated his rights under Sections 101(a)(2) and (a)(4), 29 U.S.C. Sec. 411(a)(2) and (a)(4), when they removed him from the Local's Nuclear Safety Committee. Cotter sought injunctive relief including reinstatement, damages and attorney's fees.
 
 
 2
 Judge Robert W. Sweet, in an opinion reported at 589 F.Supp. 324 (S.D.N.Y.1984) granted summary judgment for defendants. He found no evidence to support plaintiff's Section 101(a)(4) claim, and held that the Supreme Court's ruling in Finnegan v. Leu, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), barred relief on the claim under Section 101(a)(2). For reasons stated below, we affirm in part and remand in part.
 
 I.
 
 3
 Cotter is a mechanic in the Power Generation Maintenance division of Consolidated Edison (Con Edison) and is assigned, on a rotating basis, to the Indian Point Nuclear Power Station (Indian Point). Employed by Con Edison since 1959, Cotter has been an active rank and file member of the Local and has served as a shop steward for most of the years between 1961 and the present. In the spring of 1978, Business Manager James Joy created a Nuclear Safety Committee (sometimes referred to hereafter as "the Committee"), and appointed Cotter and several other shop stewards to the Committee. The purposes of the Committee were to act as a "watchdog" in areas of potential nuclear safety abuse, to disseminate safety information to the membership and to suggest improvements in safety training and practices. The Committee was not a formal part of the union structure and could not initiate or handle grievances. It was not governed by the Local's by-laws and had no independent rules. Business Manager Joy apparently established it on his own, without Executive Board approval. One of the appointed steward members initially chaired the Committee, but he had no input into appointment of its members, and neither convened meetings nor notified others when they were to be held. These functions apparently were performed by Joy, who attended most of the Committee's meetings along with several other union leaders.
 
 
 4
 Cotter was an active Committee member until January 1981, when Con Edison fired him, alleging that he had threatened a supervisor. In November 1981, the United States Department of Labor found that Cotter had been fired because of his complaints about nuclear safety violations at Indian Point, and ordered him reinstated under the "whistleblower" provision of the Energy Reorganization Act, 42 U.S.C. Sec. 5851. This court affirmed the Secretary's order, Consolidated Edison Co. of New York v. Donovan, 673 F.2d 61 (2d Cir.1982). In January 1982, Cotter instituted a wrongful discharge action against Con Edison in New York Supreme Court, and a default judgment was entered.
 
 
 5
 Cotter returned to work in March 1982. At about the same time, he helped found a dissident group within the Local, called the Right to Fight Back Committee (Fight Back). Fight Back publishes a newsletter, whose first two issues contained articles criticizing the union leadership for paying themselves high salaries and failing to convene the Nuclear Safety Committee on a regular basis or to achieve improved safety and exposure-level rules. In September 1982, then Business Manager Owens informed Cotter that he was no longer on the Committee.
 
 
 6
 In February 1983, after exhausting internal union remedies, Cotter filed this suit under Section 102, 29 U.S.C. Sec. 412, alleging he was removed from the Committee in retaliation for both his dissident activities and his lawsuit against Con Edison, in violation of Sections 101(a)(2) and (a)(4) of the LMRDA. These sections are in Title I of the statute, which is entitled "Bill of Rights of Members of Labor Organizations." Section 101(a)(2) protects a member's rights to freedom of speech and assembly.[1] Section 101(a)(4) bars a labor organization from limiting the right of any member to institute legal actions in courts or before administrative agencies.[2]
 
 
 7
 Defendants moved for summary judgment. In ruling in their favor, Judge Sweet found no evidence that Cotter's removal from the Committee was related to his lawsuit against Con Edison. Since Cotter apparently does not contest this portion of the decision, we do not comment upon it. The judge also determined that Cotter was in a "policymaking" position, and his removal was therefore excluded from Title I protection under the Supreme Court's holding in Finnegan, supra, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239, even if the removal was in retaliation for his dissident activities. The district court further held that Cotter would be barred from reinstatement to the Committee even if his removal was part of an "overall plan to suppress dissent within the union." This appeal followed.
 
 II.
 
 8
 This litigation is but one chapter in a long-standing, bitter fight between rival factions in the Local. The appeal represents, in microcosm, the difficult issues raised when one side or another comes to court as part of a struggle for political power within a union. Congressional desire both to protect the individual rights of union members and to insure democratic procedures in the governance of unions, statutorily recognized in Titles I and IV of the LMRDA, must be balanced against the legitimate concern of Congress that courts should not become unnecessarily involved in internal union affairs. Dolan v. Transport Workers of America, 746 F.2d 733, 739-740 (11th Cir.1984); Newman v. Local 1101, CWA, 570 F.2d 439, 446 (2d Cir.1978) (Newman I ).
 
 
 9
 Such issues were posed in Finnegan v. Leu, supra. In that case, the Supreme Court rejected claims under Section 609, 29 U.S.C. Sec. 529, and Section 102, 29 U.S.C. Sec. 412, of the LMRDA brought by appointed business agents who had been dismissed from their jobs by a newly elected union president because they had opposed his election. Section 609 bars "discipline" of a union member for exercising rights guaranteed by the Act. Section 102 provides independent authorization for challenging a Title I violation. Seeking to resolve a question that had long plagued and divided the circuits, see Finnegan, supra, 456 U.S. at 433 n. 1, 102 S.Ct. at 1869 n. 1, the Court held that "removal from appointive union employment is not within the scope of those union sanctions explicitly prohibited by Sec. 609." 456 U.S. at 439, 102 S.Ct. at 1872. The LMRDA protects union members as members, not in their roles as union officers or employees, even if those who wear both hats are forced to " 'choos[e] between their rights of free expression ... and their jobs.' " 456 U.S. at 440, 102 S.Ct. at 1873, quoting Retail Clerks Union Local 648 v. Retail Clerks International Ass'n, 299 F.Supp. 1012, 1021 (D.D.C.1969). The Court stated that
 
 
 10
 discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees.... We discern nothing in Sec. 609, or its legislative history, to support petitioners' claim that Congress intended to establish a system of job security or tenure for appointed union employees.
 
 
 11
 456 U.S. at 438, 102 S.Ct. at 1871. Relying on the plain language of the statute, which refers only to members, not to officers or employees, the Court noted that Congress did not intend to address the issue of union patronage; its central concern was to insure democratic internal union governance:
 
 
 12
 Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election.
 
 
 13
 456 U.S. at 441, 102 S.Ct. at 1873.
 
 
 14
 The Court reviewed the apparent overlap between Section 609 and Section 102, and held that no cause of action existed under the latter section either. Finnegan went on, however, to say:
 
 
 15
 We need not decide whether the retaliatory discharge of a union member from union office--even though not "discipline" prohibited under Sec. 609--might ever give rise to a cause of action under Sec. 102. For whatever limits Title I places on a union's authority to utilize dismissal from union office as "part of a purposeful and deliberate attempt ... to suppress dissent within the union," cf. Schonfeld v. Penza, 477 F.2d 899, 904 (CA2 1973), it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own.[11]
 
 
 16
 456 U.S. at 440-441, 102 S.Ct. at 1873. Footnote 11, flagged at the end of this passage, stated:
 
 
 17
 We leave open the question whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees.
 
 
 18
 The footnote was apparently occasioned by the separate concurrence of Justice Blackmun, joined in by Justice Brennan, which emphasized that he was "not prepared to hold that a newly elected president of a local union may discipline, ... as a matter of retaliation, all union member-employees who opposed his candidacy" (emphasis in original), and stated that he
 
 
 19
 must assume that what the Court holds today is that the newly elected president may discharge the union's appointed business agents and other appointed union member-employees who will be instrumental in evolving the president's administrative policies.
 
 
 20
 456 U.S. at 442-443, 102 S.Ct. at 1874.
 
 
 21
 The parties before us agree that Finnegan is the controlling precedent; they differ only in their interpretation of it. The principal relief sought by Cotter in his action is reinstatement to membership on the Local's Nuclear Safety Committee, which is appointed by the Business Manager. Under Finnegan, it would seem that the LMRDA allows unions broad discretion in maintaining loyalty among officers and staff. Indeed, there have been a number of decisions since Finnegan in which union officials have challenged their removal from union positions based on alleged violations of Title I of the LMRDA, but in almost all of them the ousted officials have been unsuccessful. Dolan v. Transport Workers Union, 746 F.2d 733 (11th Cir.1984) (president of local); Rutledge v. Aluminum, Brick & Clay Workers Int'l Union, 737 F.2d 965 (11th Cir.1984) (regional director of the union); Adams-Lundy v. Ass'n of Prof. Flight Attendants, 731 F.2d 1154 (5th Cir.1984) (governing board members); Childs v. Local 18, Int'l Brhd. of Electrical Workers, 719 F.2d 1379 (9th Cir.1983) (business representative); Cehaich v. Int'l Union, United Auto Workers, 710 F.2d 234 (6th Cir.1983) (benefits representative); Sullivan v. Laborers Int'l Union, 707 F.2d 347 (8th Cir.1983) (business manager); Hodge v. Drivers Local Union 695, 707 F.2d 961 (7th Cir.1983) (confidential secretary to union officer); Parini v. Int'l Brhd. of Teamsters, 568 F.Supp. 1246 (N.D.Ill.1983) (business agent); but see Runyan v. United Brhd. of Carpenters & Joiners, 566 F.Supp. 600 (D.Colo.1983) (financial secretary and business representative).
 
 
 22
 Cotter argues principally, however, that Finnegan allows an exception for "nonpolicymaking and nonconfidential" officials, and that he should be given a chance to prove that he fits within that exception. Thus, he claims that material issues of fact exist as to whether membership on the Committee was a "nonpolicymaking" position. According to Cotter, Committee members were low-level union officials who neither formulated nor administered union policy. He asserts that they were merely an informal group with limited discretion and responsibility, and no access to confidential or sensitive information. Cotter thus seeks to distinguish himself from the unsuccessful plaintiffs in the above-cited cases, all of whom, with the exception of Cehaich, were high ranking officials or employees.
 
 
 23
 In considering this argument, we assume arguendo that footnote 11 in Finnegan allows a "nonpolicymaking" exception to what otherwise seems to be the rule of the case. The concept of "policymaking" in this context is admittedly an elusive one, cf. Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and few cases have addressed it directly. See Rutledge, supra, 737 F.2d at 967-968; Cehaich, supra, 710 F.2d 234. It is true that Cotter is neither a union employee, like the plaintiff in Finnegan, nor a high-ranking union official, but we do not regard "policymaking" as confined to these groups. Rather, we agree with Judge Sweet's broad reading of the term in the context of Finnegan's interpretation of the LMRDA. Finnegan severely circumscribed the bounds of judicial intervention in intra-union factional disputes by limiting Title I claims to cases directly affecting membership rights. A member's effort to be part of the union hierarchy may implicate those rights indirectly, but it is not a Title I protected activity under most circumstances.
 
 
 24
 Cotter's membership on the Nuclear Safety Committee was an important position. As Judge Sweet pointed out, the Committee participated in the development, if not the implementation, of union policy, identified priorities for training and safety procedures, and met with management at the Indian Point plant and with members of the Nuclear Regulatory Commission. Further, and perhaps most significant, the subject of nuclear safety, particularly at Indian Point, is obviously of vital concern. It was important enough for Cotter to successfully claim that Con Edison fired him for pressing the subject too aggressively, Donovan v. Consolidated Edison Co. of New York, supra, 673 F.2d at 61, and for a group of workers to have formed a committee entitled "Concerned Employees Against Radiation Exposure" three years earlier. See Ostrowski v. Utility Workers, Local 1-2, 530 F.Supp. 208 (S.D.N.Y.1980). Indeed, the subject of nuclear safety is one of the key issues dividing Cotter's dissident Fight Back group from the Local's leadership.
 
 
 25
 The Nuclear Safety Committee was created by the Local's Business Manager, apparently in his sole discretion, and the Local has a legitimate interest in insuring that it reflects the policies of the present leadership. The Local argues that it should not be forced to give these dissidents a "bully pulpit," and indeed, it is not unimaginable that the Committee could become such a forum. Under all of the circumstances, we believe that Cotter's claim for reinstatement does not fall within the "non-policymaking" exception of Finnegan, if such an exception exists.
 
 III.
 
 26
 Relying on Schonfeld v. Penza, 477 F.2d 899 (2d Cir.1973), Cotter also argues that even if he was in a policymaking position, he has a claim under the LMRDA because he was removed from the Committee as part of an overall scheme to suppress dissent within the Local. In Schonfeld, this court affirmed a preliminary injunction restraining a union from removing the Secretary-Treasurer from office and declaring him ineligible for five years. While acknowledging that Title I "protects the union-member relationship, but not the union-official or the union-employee relationship", 477 F.2d at 904, we found jurisdiction under Title I of LMRDA. Relying on that Title's underlying purposes, the court examined the plaintiffs' particular charges in the broader context of the history of factional struggles and suppression of dissent within the union. The plaintiffs in Schonfeld alleged that the "removal of Schonfeld from office and the restrictions on his subsequent eligibility constitute[d] a form of intimidation of the membership" and "amount[ed] to reprisal for efforts by [him] and others to advocate and implement changes in union structure and procedures." 477 F.2d at 903. The claim that the union should be restrained from ousting Schonfeld from office, not ordinarily cognizable under Title I, thus was transformed into a matter affecting the rights of members and the enforcement of Title I guarantees. Under such extreme circumstances, Schonfeld held court intervention was appropriate. 477 F.2d at 903-904.
 
 
 27
 A later decision of this court, Newman v. Local 1101, Communication Workers of America, 597 F.2d 833 (2d Cir.1979) (Newman II ), affirmed an order of the district court that required a local union to reinstate the plaintiff as shop steward because the purpose of his removal was "to stifle not only [plaintiff] Newman but members generally from exercising their rights openly to criticize the Local's management, to publish their views, and to run for office." 597 F.2d at 836. Schonfeld and Newman II both pre-dated the Supreme Court's decision in Finnegan. Cotter argues, however, that Finnegan's reference to Schonfeld in the passage preceding footnote 11, see Part II of this opinion, shows that the decision in Schonfeld still has force even as applied to policymaking positions in the union hierarchy. The Fifth Circuit adopted this view in Adams-Lundy, supra, 731 F.2d 1154, in considering the Section 102 claims of a group of dissidents removed from elected office by another faction on the union governing board. In that case, the court explained why a Schonfeld exception to Finnegan, even for these important officials, is possible.
 
 
 28
 Sometimes, however, one group or faction within a union may become so entrenched and despotic that the democratic character of the union is threatened. When this happens, and when the dominant group strives to stifle dissent and efforts at reform within the union, the rights of union members to belong to an open democratic labor organization are infringed. As these are the core interests protected by the LMRDA, the Act does provide a remedy in such a case, even if the particular repressive action challenged is the removal from office of a political opponent of the dominant clique--an action not ordinarily comprehended by the terms of Sec. 102.
 
 
 29
 731 F.2d at 1158.
 
 
 30
 In the instant case, Judge Sweet disagreed, holding that the relevant language in Finnegan "refers only to the potential exception for nonpolicymaking and nonconfidential employees" and that "an order directing a union to reinstate a dissident policymaking official would run counter to the rationale of Finnegan." 589 F.Supp. at 328, n. 5.
 
 
 31
 We regard the question as a close one. On the one hand, the language in Finnegan is sweeping to the effect that Title I "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." 456, U.S., at 441, 102 S.Ct. at 1873. On the other hand, if the sole exception to the rule of Finnegan is for nonpolicymaking and nonconfidential employees, it is difficult to understand the reason for the Court's not unfavorable reference to Schonfeld. A nonpolicymaker who is the victim of a retaliatory discharge arguably would have a Section 102 claim whether or not there was a wider scheme to suppress dissent. Certainly, we can conceive of rare situations where the retaliatory firing of policymakers might be part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out. In that unusual circumstance, which would require "clear and convincing proof," see Newman I, supra, 570 F.2d at 445, reinstatement might be available under the LMRDA as part of the overall remedy that the court deems appropriate, or some other relief might be available even if reinstatement were not. In view of our prior decisions in Schonfeld and Newman II and the ambiguity of the relevant portion of Finnegan, we do not feel justified in holding that relief in that context would be wholly barred.
 
 
 32
 In the district court, Cotter sought to prove that his removal was part of an over-all scheme to suppress dissent, by detailing the history of past and present litigation between his dissident group, or its precursors, and the union leadership. These struggles date back to 1970, when a New York court compelled the union to submit to the membership the dissident group's proposed by-laws amendment. Geoghegan v. Rigley, 76 LRRM 2287 (N.Y.Sup.Ct.,1970). In 1980, Judge Motley issued a preliminary injunction ordering the Local to reinstate a dissident shop steward who had been removed for his activities in "Concerned Employees Against Radiation Exposure," a rank and file dissident group referred to earlier. Ostrowski v. Utility Workers, Local 1-2, supra, 530 F.Supp. 208. In Fight Back Committee v. Gallagher, a case still pending in the district court, Judge Ward twice enjoined the Local--once from processing its own by-laws amendments without those of Fight Bank, Fight Back Committee v. Gallagher, 115 LRRM 2685 (S.D.N.Y.1983), and, two months later, from "interfering with the right of plaintiffs to present their proposed amendments to the By-Laws ... to the membership" and "from causing or participating in disruptions" of the Local's membership meetings so as to prevent the members from considering the proposed amendments. 117 LRRM 2672 (S.D.N.Y.1984). Consolidated with that case is the latest in this string of legal battles, McAfee v. Local 1, 84 Civ. 5885, which challenges the removal of three members of Fight Back as elected shop stewards. Under all the circumstances, we believe that there is a genuine issue here as to whether the removal of Cotter from the Committee was not merely an isolated act of retaliation for political disloyalty, but was part of a "purposeful and deliberate attempt to suppress dissent within the union." Schonfeld, 477 F.2d at 904.
 
 
 33
 We therefore affirm the district court's decision that Cotter was a policymaker, but we remand for determination of whether Cotter's removal was part of a broader anti-democratic scheme by the Local. Since the parties are presently litigating other aspects of this internal union dispute, we recommend consolidation of this case with the others pending before Judge Ward.
 
 
 
 [1]
 Section 101(a)(2) provides:
 Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
 
 
 [2]
 Section 101(a)(4) provides:
 No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organization or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.