671 F.Supp. 279 (1987)
LOCAL 1199, DRUG, HOSPITAL AND HEALTH CARE EMPLOYEES UNION, RWDSU, AFL-CIO, Edward Kay, Rose Rimi, Lily Booth, Marshall Garcia, Dennis Rivera, Eustace Jarrett, Sylvia Grant-Guiterrez, Carlton Yearwood, Betty Hughley, Katherine Abelson, Angela Doyle, Dalton Mayfield, and Aida Garcia, Plaintiffs,
v.
RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL-CIO, and Lenore Miller, President, Defendants.
No. 87 Civ. 6862 (RWS).
United States District Court, S.D. New York.
October 8, 1987.
*280 Eisner & Levy, P.C. (Richard A. Levy, of counsel), Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City (Victor Rabinowitz, of counsel), for plaintiffs.
Markewich Friedman & Markewich, P.C., New York City (Daniel Markewich, Jon Quint, of counsel), for defendants.
Connerton & Bernstein, Washington, D.C. (Jules Bernstein, Laurence E. Gold, Eric Steele, of counsel), Terrell C. Evans, Brooklyn, N.Y., for intervenor.

OPINION
SWEET, District Judge.
Plaintiff Edward Kay ("Kay"), Secretary-Treasurer of Local 1199, Drug, Hospital and Health Care Employees Union ("Local 1199" or "Local"), an affiliate of the International Retail, Wholesale and Department Store Workers Union ("RWDSU"), has moved pursuant to Fed.R.Civ.P. 65 for a preliminary injunction staying the RWDSU's temporary suspension of Kay from his Local 1199 duties as an officer. Upon the facts and conclusions set forth below, the injunction will issue.

Prior Proceedings
By letter of September 23, 1987, Lenore Miller ("Miller"), President of RWDSU, delivered a letter to Kay suspending him from his duties and activities as Secretary-Treasurer of Local 1199. That evening, counsel for Local 1199 made an ex parte application. Rather than hear counsel ex parte, the court directed parties to appear at 9:30 a.m. on September 24.
On the morning of the 24th, Local 1199, Kay, other members of the Executive Council of Local 1199, and two rank-and-file members of 1199 filed a lawsuit against the RWDSU praying for temporary, preliminary and permanent injunctive relief, declaratory relief, and damages. At a hearing that morning, the court accepted the newly filed case as related to Johnson v. Kay, 87 Civ. 6482 (RWS), and argument was had on the application for a Temporary Restraining Order ("TRO"). The court issued a temporary restraint staying Kay's suspension, and made the application for a preliminary injunction returnable October 1, 1987, at 9:30.
President Georgianna Johnson ("Johnson") of Local 1199 made an oral application on September 24 to intervene or, alternatively, to consolidate this case with 87 Civ. 6482, which was denied with leave to renew in formal motion papers.
The afternoon of September 24, the court signed an order referring both this case and 87 Civ. 6482 to a Special Master for a report and recommendation on the issues in both lawsuits that related to the construction of union constitutions and the pendant state law claims in the actions. Parties were directed to appear before the Special Master the morning of September 28. While I was absent from the jurisdiction from Friday afternoon, September 25, and Thursday morning, October 1, four orders to show case in this action and the related case had been presented to Part I, and a barrage of motions had been made before the Special Master. No relief was granted on any of these applications.
On October 1, 1987, Johnson renewed her application to intervene, which was granted. The RWDSU moved to strike Local 1199 as plaintiff in this action, which was done for the grounds stated in the court's oral decision of September 21 in the related *281 case. Having intervened, Johnson moved to disqualify the firm Eisner & Levy in the new action on the same grounds upon which she had moved in the related case, in which Eisner & Levy had been disqualified in an oral opinion issued September 22, 1987. The court denied Johnson's motion on the grounds that the matters upon which Levy had advised her and that had caused his disqualification in the related case were not sufficiently congruent with the issues in the current case to require the harsh remedy of disqualification.

Facts
On September 23, 1987, Miller delivered a letter to Kay removing him from office on the grounds that an "emergency situation" existed. The letter read:
Dear Mr. Kay:
You are hereby notified that charges have been filed against you under Article XXV of the RWDSU Constitution. Copies of the charges and supporting affidavits are enclosed.
Pursuant to Article XXV, Section (b) of the RWDSU Constitution, since I have reason to believe that an emergency situation exists requiring the institution of temporary sanctions, you are hereby temporarily removed from the office of Secretary-Treasurer of Local 1199, RWDSU, AFL-CIO, CLC pending the outcome of a hearing to be held within sixty (60) days before the RWDSU Executive Board.
You will be notified by letter within the next week of the time, place and further details of the hearing.
Until the outcome of the hearing, you are to cease all duties and activities attendant to the office of Secretary-Treasurer of Local 1199.
As shown by the facts of a case related to this action, Johnson v. Kay, 87 Civ. 6482 (RWS), which are adopted here insofar as they are relevant, Kay has been the leader of a faction of Local 1199 that has been engaged in what appears to be a struggle with Johnson for control of the Local. One of the "duties and activities" that Kay performs as Secretary-Treasurer is to sit on the Local's Executive Council, the body that is challenging Johnson for control of the union. Kay has been characterized as the leader of the anti-Johnson faction, and has so far enjoyed the support of a majority of the members of the Executive Council aside from Johnson. With Kay at the helm, the Executive Council has proposed a slate of amendments to the Local's Constitution which all parties agree will weaken the powers of the presidency and strengthen the powers of the Executive Council. According to the Kay group, the amendments will also strengthen the powers of the members at large, resulting in a more democratic Local. The contest over the amendments has been spirited, and the battle has been conducted not only through normal union channels of debate, but also in this court, with both factions seeking to enjoin the other on numerous occasions.
The RWDSU suspended Kay on the basis of charges brought by Johnson. In a letter from Johnson to Miller dated September 17, 1987, Johnson charges that Kay "has been engaged in a campaign to seize control of the Local and deprive me of my constitutional rights and powers as President of Local 1199." Johnson refers explicitly to the ongoing lawsuit, Johnson v. Kay, and apparently forwarded some of the pleadings in that case to Miller as evidence of wrongdoing on Kay's part. Johnson also charged Kay of dual unionism in violation of section XXV of the RWDSU constitution: "Secretary-Treasurer Kay has been working vigorously to achieve the secession of Local 1199 and its affiliation with [a different international union]. This effort at dual unionism must not be permitted to continue or succeed."
Johnson claims no first hand knowledge that Kay has engaged in "dual unionism," but included in her submission to Miller declarations signed by three Local 1199 staff members, Laverne Weekes, Neil Cole and Fran Wynne. The three declarations report statements Kay is said to have made at staff meetings on August 3 and August 20, 1987, seven and five weeks before the date of Kay's suspension.
Neil Cole states as follows with respect to the August 3, 1987 staff meeting:

*282 During the meeting, Edward Kay, Local 1199 Secretary Treasurer, stated that seceding from the RWDSU and reuniting with a National Union of Hospital and Health Care ("National") were priority matters for the Union. Moreover, Kay indicated that Local 1199 and the National should merge with the Service Employees International Union ("SEIU").
Fran Wynne alleges that at the August 3, 1987 staff meeting Kay made the following statement:
It's no secret that I want the Union to merge with [Service Employees International Union ("SEIU")].
She adds, in her own words:
Kay explained that merging with SEIU was consistent with his goal of forming "one health care union." He rationalized that since other industries are covered by one major labor organization, the health care industry should be similarly covered by one labor organization, SEIU.
Wynne's report says nothing of Kay's suggesting disaffiliation from the RWDSU.
LaVerne Weekes, describing the alleged August 20, 1987 staff meeting alleges as follows:
During the August 20 staff meeting, however, Kay stated, "It's no secret that I want the Union to merge with SEIU." He further explained that having Local 1199 rejoin the National Union of Hospital and Health Care Employees ("National") and then merging with SEIU are in the best interest of the Local 1199 membership. He also contended that bringing Local 1199, the National and SEIU together as "one health care union" would result in a stronger labor organization. Kay indicated that in the near future he would commence a campaign to merge Local 1199 with SEIU in the above described manner.
With respect to RWDSU, Kay maintained that RWDSU was exploiting Local 1199, stating that RWDSU was "no good for our members." In his estimation, RWDSU provided "nothing" to Local 1199 for its per capita dues payments.
These are the totality of the allegations upon which Miller removed Kay from office, asserting the existence of "an emergency situation." There is no allegation in any of the charges against Kay that he joined or advocated that others join another union which seeks to influence or displace the international or an affiliate, nor was the suspension based upon any conduct other than Kay's statements on the occasions referred to.
Although apparently some of the pleadings of Johnson v. Kay were attached to the material that Johnson sent to Miller, the parties to this dispute have not identified which of the voluminous submissions she included, and Miller's September 23 letter to Kay does not specifically identify them.
By letter of September 29, Miller informed Kay that a hearing on the charges against him would begin in Florida[1] on October 25, 1987, one week before voting on the amendments proposed by the general membership of Local 1199 must be completed. Kay, whom the proceedings in both this and the related case have shown to be the leader of the faction supporting the amendments, has become a symbol of the struggle. The practical result of the suspension, if it is given effect, will almost certainly be to remove Kay entirely from the debate in his role as leader of the pro-amendment faction of the Executive Council.
At a hearing on October 7, testimony was received on the circumstances of the meetings at which Kay was alleged to have made the statements, as well as on exactly what it was that he said. There are four meetings now at issue, some of which were held on different dates than those contained in the original declarations accusing Kay of dual unionism, because it was pointed out in Kay's submissions that either the declarants or Kay were not in the area on the original dates. The meetings are: a *283 July 13, 1987 staff meeting; an August 3rd staff meeting; an August 24th staff meeting; and an Executive Council meeting sometime in May or June of 1987.
Kay testified that he was uncertain about the exact dates that he made statements because he attended a great number of meetings, but said that he had, indeed, discussed the issue of merger with the SEIU and the National. According to Kay, at one meeting he reported to the staff that the RWDSU had formed a committee to consider merger with other unions, particularly the National. Kay also reported to the staff his annoyance that he, a proponent of the action which the newly formed committee would study, had not been placed on the committee.
Kay also testified that he had never discussed with the staff either disaffiliation with the RWDSU or the idea of Local 1199 merging directly with the National. He said that it was not now his view that Local 1199 should leave the RWDSU, but rather that it was both his view and the policy of the union that a merger between the RWDSU and the National should be explored, as evidenced by the existence of the merger committee.
Testimony from other witnesses established that at the July 13 meeting, LaVerne Weekes asked whether there was any intention of merging with the National or the SEIU. Weekes has recently been appointed a Vice President of the Union by President Johnson but at the time was a union organizer. Dennis Rivera, a member of Local 1199's Executive Council, was in the chair, but Kay, seated on the podium, rose to the microphone and volunteered to answer the question. By all accounts Kay responded to the effect that "things were not heading in that direction." Weekes testified that Kay later spoke to her privately to tell her that the staff was not yet "ready" to discuss the issue.
No witness testified that there was any discussion on the 13th about seceding from or disaffiliating with the RWDSU. Consequently, the evidence with respect to the July 13 meeting is that, if anything, Kay avoided discussing movements that RWDSU itself had taken towards a merger.
There was conflicting testimony about what was said at the August 3 staff meeting, but it was undisputed that the question of merger with the National and the SEIU was broached. The most reliable evidence of the contents of the discussion comes from notes of the meeting taken by Shirlee Evans, a 15-year member of the union who regularly attends staff meetings and customarily takes notes at them. Evans took notes of Kay's remarks, which were produced for the first time at the hearing. They read: "If the National Union joins the RWDSU, then we go back [to the SEIU],"[2] whiich is completely consistent with Kay's testimony that he desired to have the RWDSU merge with the National and then the SEIU. Several witnesses testified that Kay also said, "It's no secret that I want the union to merge with SEIU," or words to that effect. No one testified that Kay had advocated either secession or disaffiliation at the August 13 meeting.
With respect to the August 24th staff meeting, the evidence established that Kay made a statement virtually identical to that made on August 3rd, that it is "no secret" that he wanted to merge with the SEIU.
Finally, there was evidence offered as to comments Kay made to the Executive Council sometime in May or June. Again, the testimony established that Kay said words to the effect that it is "no secret we want to go to the SEIU." Kay did not identify who the "we" was, and the reaction of Executive Council members was that further discussion on the Executive Council on the issue would be appropriate. There was no testimony that Kay suggested either disaffiliation or secession of Local 1199 from the RWDSU, and he did not outline the means for the proposed merger with SEIU.
*284 It has been put forward that Kay advocated Local 1199's withdrawal from the RWDSU when he ran for union office, and was not disciplined under Article XXV at the time.
This intramural struggle has brought Local 1199 to the brink of chaos. Not only are problems arising from the straightforward management difficulties posed when any chief executive disagrees with the major policy body of an organization, here the problems are multiplied by the time and money the officers are spending in warring with each other  both in the union hall and in the courthouse.

Applicable Law
In order to warrant a preliminary injunction, Kay must show: "(1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party seeking relief." Rivera v. Feinstein, 636 F.Supp. 159, 162 (S.D.N.Y.1986).
Kay has charged violations of his rights based on Title I of the Labor Management Reporting and Disclosure Act ("LMRDA"), § 101(a)(2), codified at 29 U.S.C. § 411(a)(2), as construed by the Second Circuit in Cotter v. Owens, 753 F.2d 223 (2d Cir.1985), and also of his contractual rights under the RWDSU's constitution. To a large degree, the actions overlap. As will be demonstrated, a showing the RWDSU's actions are without authority by the terms of its constitution lends credence to Kay's claims that his suspension is but part of a pattern to suppress dissent.

"Dual Unionism" under the RWDSU Constitution
The provision of RWDSU's constitution under which Miller suspended Kay provides:
Dual Unionism
(a) A member or officer or local union or other affiliate may be censured, fined, suspended, expelled, removed from office, placed in trusteeship or otherwise disciplined for holding membership, office or position in a dual union not affiliated with this International, which attempts to shape or influence the policies or actions of, or to displace this International or an affiliate thereof, or for actively supporting or advocating such a dual union.
Article XXV, RWDSU constitution.
The term "dual union" is not elsewhere defined in the constitution. Based on her letter to Miller, Johnson's view, which apparently the RWDSU shares, is that endorsing secession from Local 1199 and merger with the SEIU, constitutes "advocating such a dual union" under this section. As Johnson put it in the letter to Miller that provoked the suspension: "Kay has been working vigorously to achieve the secession of Local 1199 and its affiliation with SEIU. This effort at dual unionism must not be permitted to continue or succeed."
As the evidence has shown, however, at the meetings in question Kay did not advocate disaffiliation with the RWDSU, and advocated merger only in terms of a merger of RWDSU, the National, and the SEIU. However, even if Kay had said what Johnson attributes to him  advocacy of disaffiliation and merger  it would not constitute "dual unionism" under the RWDSU constitution. The activities that Johnson and Miller would sweep under the rubric "dual unionism" are explicitly permitted by the RWDSU constitution, and consequently advocacy of them cannot be what Article XXV proscribes. Article XVII, titled "Dissolution, Secession or Disaffiliation" lays out the procedures that must be followed for a disaffiliation or secession, and the liabilities and responsibilities of the seceding party and the former parent union:
No affiliate can dissolve, secede or disaffiliate from the International without the approval of the International Executive Board. In the event of dissolution, secession or disaffiliation of any affiliate, properties, funds and assets, both real and personal, of such affiliate shall become the property of this International Union.
The provision goes on to state that the disaffiliating Local would be required to *285 meet various financial obligations to the International and to various pension and deferred compensation plans, and that it will hold the International harmless with respect to any claims or liabilities resulting from any obligations to those plans. There is no prohibition in this section on discussions about secession, and, quite the contrary, that procedures are spelled out for secession and disaffiliation necessarily creates a right for members to talk about them. It cannot be that the RWDSU constitution allows actions (as long as proper procedures are followed) but prohibits its members and officers to talk about taking them.
Similarly, Article X § 5 provides: "No local union or other affiliate shall merge or take any action leading toward merger with any labor organization not affiliated with this International without the prior approval of the International Executive Board." But, of course, in order to decide that it, as a local, wished to approach the Executive Board for approval to take "action" leading to merger with another organization, the officers and the members of the local would first need to discuss the issue among themselves. That is, the local cannot act before prior approval, the local cannot seek prior approval until the officers of the local have discussed the issue and decided to do so, and, consequently, Article X § 5 implicitly permits discussion in local unions about merger.
In addition, the RWDSU concedes that merger and realignment have been topics of continuing discussion in the union for some time. After this concession, the RWDSU tried to walk a fine line at oral argument. It argued that members of the international's executive board could discuss and advocate disaffiliation and merger, and that rank and file union members could discuss and advocate disaffiliation and merger, but that officers of locals could not. As an intuitive matter, it does not seem sensible that the top and the bottom echelons of a union are both permitted to discuss an issue while those in the middle are not. RWDSU's attempt to reconcile its past conduct in permitting such discussion with the theory of Article XXV that it now puts forward does not accord with the language of the Article itself, which provides for the censure, firing or suspension of any "member or officer or local union" for advocating dual unionism (emphasis added). Thus, if the words that Kay is alleged to have spoken as an officer five and seven weeks before his firing violated Article XXV, then his platform as a candidate did as well. The construction that RWDSU urged at argument  that a member can advocate what an officer cannot  contradicts the explicit language of the constitution, and appears to contribute to the inference that the charges against Kay are pretextual.
The RWDSU has submitted materials in a brief submitted on October 5 outlining what it deems the legislative history of the RWDSU constitution. According to the RWDSU, the constitution has been recently amended to make disaffiliation more difficult. It is submitted that the amendments establish a rule that "disaffiliation from the RWDSU would be viewed with extreme disfavor, a reversal of prior policy." "Disfavor," however, is not proscription, and thus the implied right to discuss disaffiliation and merger is not affected by such "legislative history." As counsel colorfully stated the issue at argument, dual unionism is treason, and you do not say that treason is permitted only under certain circumstances.
Moreover, even absent this clear distinction between "disaffiliation" and "dual unionism" apparent in the language of the RWDSU constitution and its past practices, Kay has submitted authorities to demonstrate that they are distinct as a matter of law. An authoritative glossary of labor law terminology defines "dual unionism" as follows:
Secret or open efforts of union members to undermine the union and substitute another union as representative of employees....
Labor Relations Reporter (BNA), LRX 226-27 (1987). Another authority provides:
Dual unionism may ... be used as a charge (usually a punishable offense) leveled *286 at a union member or officer who seeks or accepts membership or position in a rival union, or otherwise attempts to undermine a union by helping its rival.
Roberts, Roberts' Dictionary of Industrial Relations, 160-61 (3d ed. 1986).
"Disaffiliation" is defined as "[w]ithdrawal of a local union from a national union or withdrawal of a national union from a parent federation." Labor Relations Reporter (BNA) LRX at 198. A distinction between dual unionism and disaffiliation appears to be that dual unionism involves the displacement of a collective bargaining representative in favor of a rival union.
The usage of the term "dual unionism" by the National Labor Relations Board and the federal courts is consistent with this construction. For example, in Special Machine and Engineering Co., 109 N.L.R.B. 838 (1954), the term "dual unionism" is used, id. at 844, to describe the efforts of a union member to explore "the possibility of having the CIO supplant the Union as bargaining representative," id. at 840. Likewise, in NLRB v. Teamsters Local 815, 290 F.2d 99 (2d Cir.1961), a member's "dual union activity" consisted of being "active in behalf of the rival union and sign[ing] a card authorizing [the rival union] to be his exclusive bargaining representative," where his own union was the incumbent representative, id. at 101.
Similarly, cases have been cited arising under Title I and analogous state statutes in which dual union activity lawfully punishable by adverse union action, such as expulsion or removal from office involved support of a rival union in a dispute over representation of employees. See, e.g., Airline Maintenance Lodge 702, IAM v. Loudermilk, 444 F.2d 719 (5th Cir.1971); Davis v. Ampthill Rayon Workers, Inc., 446 F.Supp. 681 (E.D.Va.1978); Ballas v. McKiernan, 35 N.Y.2d 14, 358 N.Y.S.2d 695, 315 N.E.2d 758, cert. denied, 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974); Futterman v. New York State Nurses Ass'n, 124 Misc.2d 693, 477 N.Y.S.2d 255 (Sup.Ct.1984).
On the other hand, at least one court appears to have defined any effort at disaffiliation as dual unionism:
When local officers encourage local members to break away from the national organization and form an independent union, it clearly undermines the responsibility of local members to the national organization, and threatens the enforcement of contractual obligations. Therefore, the advocation of dual unionism is not protected....
Sawyers v. Grand Lodge, Int'l Ass'n of Machinists, 279 F.Supp. 747, 756 (E.D.Mo. 1967).
The distinction between dual union activity and advocacy of disaffiliation is particularly significant with regard to their effect on the collective bargaining relationship, and, consequently, on the legitimacy of adverse union action in response to each of those activities. Dual unionism impairs the ability of a union to carry out its collective bargaining responsibilities by diminishing its authority as bargaining representative. On the other hand, disaffiliation efforts unaccompanied by dual union activity may have little effect on the collective bargaining relationship. It is precisely this distinction that was drawn by the Court in Tile, Marble & Terrazzo Workers v. Granite Cutters Local 106, 621 F.Supp. 1188 (E.D. N.Y.1985), aff'd, 805 F.2d 391 (2d Cir.1986). In that case, the court held that a trusteeship could not be imposed to prevent disaffiliation of a local where disaffiliation "would not affect any bargaining responsibilities of the International or any other entity, because those responsibilities were at all times in the hands of the Local." Id. at 1193. The court distinguished cases in which trusteeships to prevent disaffiliation had been approved, since those cases had "involved attempts by locals to withdraw from multi-union bargaining units, actions which directly affect the collective bargaining relationship." Id.
Likewise, in Davis v. Ampthill Rayon Workers, Inc., 446 F.Supp. 681 (E.D.Va. 1978), aff'd, 594 F.2d 856 (4th Cir.1979), a director of an independent local union first sought affiliation of the local with the *287 Steelworkers International, then, after his affiliation efforts failed, solicited Steelworkers authorization cards from the membership, "not for affiliation but to supplant the local union." Id. at 685. The director's removal from office came only after he began his active support of "a rival union in its attempt to supplant defendant as bargaining agent." Id. at 686. The holdings in these cases strongly suggest that the distinction between dual unionism and advocacy of disaffiliation is the effect of the actions on the bargaining unit. Logically, if disaffiliation is equivalent to "dual unionism"  "the most serious offense in the union's books"  then it is difficult to see how it would ever be permitted under any circumstances, as it plainly is under the RWDSU constitution.

Emergency Nature of Suspension
The only way that the RWDSU could suspend Kay effective immediately was by certifying that an "emergency situation" exists. Article XXV(b) provides: "Whenever the International President has reason to believe that an emergency situation exists requiring the institution of temporary sanctions, he may temporarily remove an officer...."
As the RWDSU concedes, the language respecting the existence of an emergency in Article XXV tracks the language in Article XXII, which the Hon. Leonard B. Sand had occasion to construe in RWDSU v. National Union of Hospital and Health Care Employees, 577 F.Supp. 29 (S.D.N.Y. 1984). In the Hospital Employees case, Judge Sand held:
The term "emergency" used by the RWDSU in its Constitution, connotes a situation "developing suddenly and unexpectedly and demanding immediate action."
Id. at 33.
As noted, Kay (as well as a number of other 1199 officers, including, at the time, Johnson) campaigned openly on a platform supporting merger or affiliation with other unions representing health care workers, so the RWDSU has known of his views at least since April 1986. Despite this, it took no action to limit discussion on the topic until a few weeks ago, and, as noted, has itself commenced merger talks with other unions. There is no evidence in the record of any imminent harm, or any special consequences that need to be forestalled by procedures available under the constitution only in an emergency situation.

Deliberate Attempt to Suppress Dissent
The charges against Kay were brought at the behest of Johnson in the heat of a power struggle between Johnson and Kay. As noted, Kay is the leader of the proamendment faction in the Local, and, as such, takes on a special symbolic stature. It is no coincidence that at the height of this battle, while the fight is so bitter that it has spilled out of the union hall into the federal courts, that Johnson suddenly recommends Kay's suspension for alleged comments on views that he has publicly espoused for over a year.
Under most circumstances, "The LMRDA protects union members as members, not in their roles as union officers or employees...." Cotter, 753 F.2d at 226. The theory behind this rule is that "the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." Finnegan v. Leu, 456 U.S. 431, 441, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982). However, Cotter v. Owens, 753 F.2d 223 (2d Cir.1985), carved an important exception to the Finnegan rule. Under certain circumstances, a union official can become a symbol for a movement, and discipline of that single official is thus converted into "a form of intimidation of the membership." Cotter, 753 F.2d at 228 (quoting Schonfeld v. Penza, 477 F.2d 899, 903 (2d Cir.1973)). The question that faces the court in resolving such an issue is whether the discipline in question is "merely an isolated act of retaliation for political disloyalty" or is rather "part of a `purposeful and deliberate attempt to suppress dissent within the union.'" Id. at 230. The Circuit has indicated that it considers such circumstances "rare" and requires the aggrieved party to carry his burden with clear and convincing proof. Id. at 229.
*288 Under the circumstances of this case, Kay may prevail under a Cotter theory. That the charges against him were initiated by the leader of the faction against whom he is pitted in a struggle, that the charges are for expressing views that he has publicly espoused for well over a year, that the RWDSU has countenanced such discussion at virtually every level of the union but now seeks to advance a theory of its own constitution and its actions pursuant to it that appears at odds with the express language all contribute to the conclusion that Kay was suspended not for the reasons stated, but to stifle his voice in the fight over the amendments. This may constitute a purposeful and deliberate attempt to suppress dissent within the meaning of the Cotter rule.
However, since in terms of the standards for preliminary relief, Kay has shown probability of success on his contractual claims (on the grounds of what he in fact said, of the definition of dual unionism, and of the lack of an existence of an "emergency situation"), it is not necessary at this time to resolve the Cotter issue.
As for irreparable damage, it has been noted elsewhere how fragile union democracy can be. See Navarro v. Gannon, 385 F.2d 512, 520 (2d Cir.1967), cert. denied, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968). If the suspension goes forward, there is a high probability that the election on the proposed constitutional amendments would be fatally tainted, causing irreparable harm to union democracy. Aside from the practical harm that each union member would suffer in a protracted legal effort to sort out the pieces of an invalid election, the damage to the sense of fair play and democracy that the union would endure goes far beyond the harm that would be visited upon any of the individual litigants here. This is particularly true with respect to Local 1199, which is already somewhat adrift because of the strain that the contest among the officers has put on it.
On the other hand, the harm to the RWDSU if the injunction staying the suspension is issued appears slight. The RWDSU has put forward no facts and no explanations as to how it would be injured by Kay's remaining in his position. Balancing the hardships weighs in favor of issuing the injunction.
Having found that Kay has a high likelihood of success on the merits, that there is a high probability of irreparable harm if the injunction does not issue, and that the balance of hardships weighs in favor of issuing the injunction, the RWDSU is enjoined from temporarily suspending Kay pending the outcome of this action. If circumstances change, RWDSU is granted leave to move to modify or vacate the injunction.
IT IS SO ORDERED.
NOTES
[1] If they choose, parties are given the option of presenting some testimony in New York instead of Florida on earlier dates.
[2] An arrow after "back" points to the initials "SCIU" a few lines above, which Evans testified was a misspelled "SEIU."