Henry J. HELMER, Patrick Bencivengo, James Crow, William Dodd, John Duffy, James Kelly, Jack Lopez, James Mottett, Charles Piscopo, Manuel Sanchez, Philip Varrichio and John Walsh, Jr., Plaintiffs,

v.

Eugene BRIODY, Joseph Zummo, Jack Murphy, Michael Cotter, Richard Besthoff, each in his individual capacity only; Antonio Sanchez, in his official capacity as Secretary–Treasurer of Local 1–2, UWUA, AFL–CIO and in his individual capacity; Joseph Fino; and Local 1–2, Utility Workers Union of America, AFL–CIO, and Consolidated Edison Company of New York, Inc., Defendants.

No. 89 Civ. 0467 (RWS).

United States District Court, S.D. New York.

March 27, 1991.

Kevin G. Jenkins, New York City (Irwin Geller, of counsel), for plaintiffs.

Donald F. Menagh, P.C. (Vito Mundo, of counsel), and Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City (Arthur Z. Schwartz, of counsel), for all defendants except Consolidated Edison.

## OPINION

SWEET, District Judge.

Defendant Eugene T. Briody ("Briody") and individuals allied in interest with him together with Local 1–2 Chapter (the "Local") of the Utility Workers Union of America ("UWUA") have moved for summary judgment dismissing the complaint of plaintiff Henry J. Helmer ("Helmer") and individuals allied in interest with him. For the reasons set forth below, the motion for summary judgment is granted, and the complaint is dismissed.

## PRIOR PROCEEDINGS

The parties and prior proceedings in this lawsuit have been described in earlier opinions, familiarity with which will be assumed. *Helmer v. Briody,* 721 F.Supp. 498 (S.D.N.Y.1989) (*Helmer I*), *Helmer v. Briody,* 747 F.Supp. 1020 (S.D.N.Y.1990) (*Helmer II*).

1. All of Helmer's claims for injunctive relief appear to have become moot due to recent

Before making the present motion, the Local moved for summary judgment on Helmer's claim for violation of the Local's duty of fair representation. Although that motion was denied in *Helmer I,* the Local renews it here on the basis of the summary judgment motion made by Consolidated Edison Company of New York ("Con Ed") and granted, after submission of the present motion, in *Helmer II.*

## THE FACTS

This is a suit for damages arising out of Helmer's removal in 1988 from his position as Business Manager of the Local, which represents certain of the Con Ed employees.[1] The relevant facts involve parties and events dating back almost 20 years in the history of the Local.

In 1971, James Joy ("Joy") was elected to the position of Business Manager, the Local's top collective bargaining position. Shortly thereafter, he appointed his campaign manager Helmer to fill a vacant Business Agent position. Joy retained his position in the elections in 1974, 1977 and 1980. In 1980, he was elected national President of the UWUA, for which he left his position in the Local.

Between 1981 and 1986 there was an increase in internal strife in the Local and a considerable amount of litigation among various members and factions. In March 1986, allegedly in an attempt to prevent a group led by Michael Cotter ("Cotter") from winning the Local's June 1986 election, a group of officers led by Helmer and Briody asked Joy to return to the Local and run as the head of an incumbent slate. In putting together his ticket, Joy selected Briody for the Local's top administrative position, President, and designated Helmer as one of his Assistant Business Managers. Joy's slate won the 1986 election.

In early 1987, following a series of meetings to reduce the Local's internal conflicts, Joy suggested that Cotter become an Assistant Business Manager and merge his political organization into the management

events in the Local.

group of the Local. Cotter agreed, and Briody appointed him to a newly-created Assistant Business Manager position. This appointment was ratified by vote of the membership at the April 1987 membership meeting.

Joy remained with the Local as Business Manager until November 1987, when he decided to resume full-time responsibility as President of the UWUA. When he left, Briody appointed Helmer to be Business Manager in Joy's place. This appointment was ratified by the members at the Local's November 1987 meeting.

As Business Manager, Helmer began to experience problems dealing with his fellow officers. In June 1988, he fired one of the Local's attorneys and caused the General Counsel to resign. He then hired a new law firm without the approval of the Executive Board. On July 11, 1988, he filed disciplinary charges against Cotter and sought his removal from office. On July 28, following a trial on these charges, the Executive Board voted 31 to 1 against Cotter and recommended his removal from office. A meeting was scheduled for September 20 for the members to vote whether to accept this recommendation.

Prior to the September 20 meeting, Cotter undertook an intensive political campaign to preserve his position. He attacked Helmer directly on many issues, distributed a number of leaflets and even attempted to send a mailing to members' homes. In order to obtain the Local's mailing list for this mailing, Cotter was forced to seek a preliminary injunction, which was granted on August 22, 1988. *Cotter v. Helmer*, 692 F.Supp. 313 (S.D.N.Y.1988) (Conboy, J.). He then obtained a second injunction to require that the voting at the September 20 meeting be done by secret ballot. *Cotter v. Helmer*, 132 LRRM 2351, 1988 WL 96162 (S.D.N.Y.1988) (Leisure, J.). In response to Cotter's campaign, Helmer published and distributed, on Union letterhead and at Union expense, four leaflets attacking Cotter on a variety of issues.

On September 20 the members voted 1,300 to 450 to reject the Board's recommendation and to keep Cotter in office.

After this result, there seems to have been a backlash of feeling against Helmer by many of his fellow officers, who sought an end to the divisive political battles being fought in the Local.

On September 22, Helmer called a joint meeting of the Local's full-time officers ("the Staff") and its Executive Board. During the meeting, various people expressed the view that for the good of the membership and in order to reduce the bickering among the leadership Helmer should consider stepping down. The Executive Board also voted to discharge the counsel Helmer had hired and to rehire the attorneys who had previously represented the Local.

The Staff had another meeting on September 26, 1988. Again, several people voiced the opinion that Helmer could not lead the Union and stated that it was in the best interests of the membership for Helmer to resign. After some discussion, the Staff asked Helmer and Briody to sit down and talk about a peaceful resolution. A suggestion was made by one of Helmer's supporters, Business Agent Sam Papa ("Papa"), that Joy be consulted to see if a job might be available in the UWUA for Helmer.

The following day, Helmer and Briody met with Joy and explained the state of affairs in the Local. Joy offered Helmer a position working for the national union as Director of Organization. In fact, Briody had been offered the same job about six weeks earlier. Helmer said that he would consider accepting the position.

On September 29, 1988, Joy met Helmer and Briody again. Helmer stated that he would accept the job offer if he could be assured that his supporters on the Staff would keep their jobs and would be guaranteed a place on the incumbent election slate in February 1989. Briody at first agreed to these terms, but the agreement broke down over Helmer's request that the promise be put in writing and held by a neutral third party, and the meeting ended without resolution. Two days later, Helmer turned down Joy's job offer and stated that he

intended to stay on as Business Manager of the Local.

On October 3, 1988, the Local's four Assistant Business Managers, including Cotter, brought charges against Helmer. On October 5, 1988, they amended the charges to add more detail. Helmer was accused of seven violations:

1) misusing the Local's funds for his personal benefit by incurring excessive and unreasonable expenses on union business and by using his union expense account to pay for personal expenses;

2) misusing the Local's funds for his own political ends;

3) violating the By–Laws by failing to "establish friendly relations" between Con Ed and the Local;

4) violating the By–Laws by not assigning the Assistant Business Managers and Business Agents to serve the "best interests" of the Local;

5) violating the By–Laws by "willfully harming a fellow officer";

6) violating the By–Laws by refusing to recognize certain Assistant Business Managers and Business Agents who had been properly nominated and approved by the members; and

7) violating the By–Laws by ignoring the Executive Board's decision to rehire the Local's previous attorneys.

The second charge related to Helmer's use of the Local's funds for the pamphlets distributed in the campaign against Cotter, and the fifth charge related to his filing of charges against his fellow officer Cotter.

On October 11, 1988, Local 1–2's Secretary–Treasurer, defendant Antonio Sanchez ("Sanchez"), received an undated letter from Helmer purporting to be a letter of charges against Eugene Briody. On October 12, 1988, Sanchez returned the charges to Helmer with the request that they be dated and the suggestion that Helmer provide further detail on the charges. Helmer never resubmitted the charges.

Helmer's trial on the charges against him was initially scheduled for October 14, 1988. He requested a one-month adjournment but the Board agreed only to a one-week delay to October 20. He again sought a longer adjournment and also requested the disqualification of certain members of the Trial Committee ("the Committee"). When Sanchez responded to these requests that he had no authority to grant an adjournment or to disqualify Committee members, Helmer filed suit before the Honorable Peter K. Leisure seeking to enjoin or delay the trial. *Helmer v. Zummo*, 88 Civ. 7350 (PKL) (S.D.N.Y. filed Oct. 18, 1988). Judge Leisure refused to enjoin the trial but suggested that the parties agree to a reasonable postponement. Thereafter, the Committee agreed to delay the trial until October 28, 1988 and scheduled a meeting for the membership to vote on the Committee's recommendation for no later than November 9, 1988.

On October 18, Helmer was provided with copies of all of the expense receipts which were related to the first charge against him, the charge of incurring excessive expenses and misusing union funds for personal benefit. On October 27, the day before his trial was scheduled to begin, Helmer requested that Sanchez produce all of the expense records of Briody and of the two prior Business Managers of the Local. Many of these records were unavailable because they had been seized by the authorities who were investigating Helmer's allegations of corruption in the Local.

Prior to the beginning of his trial, Helmer questioned the impartiality of the Trial Committee chairman Joseph Fino ("Fino"), because Fino had been one of the people at the September 22 meeting who had called for Helmer's resignation. Fino responded that he had merely been expressing the concerns of the members whom he represented, and that he felt that he could perform his duties as chairman fairly and impartially. As chairman, he would not participate in the deliberations of the Committee or the vote on the charges against Helmer.

The trial lasted for four days, after which the Committee voted Helmer guilty on each of the charges and recommended his removal from the office of Business Manager for each infraction. The outcome

was presented to the Local membership at a meeting on November 9, 1988, and was approved by the members by a margin of about 70 votes out of a total of over 1400 votes cast. Following this vote, Helmer appealed to the National Union, which declined to hear his case.

Having been discharged form his union employment, Helmer next sought to return to the position which he had held at Con Ed prior to becoming an officer of the Local. As discussed more fully in *Helmer II*, this request was denied because he was held to have retired from Con Ed in 1979 when he cashed out his pension with the company. Because Helmer was therefore not employed by either the Local or the utility, the Local determined that Helmer was no longer within its jurisdiction and could no longer be a member of the union. Accordingly, Helmer's membership rights in the Local were terminated.

DISCUSSION

*1. The Standard for Summary Judgment.*

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. In deciding a motion for summary judgment, the court is not expected to resolve disputed issues of fact, *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues which require a trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. If the opponent succeeds in establishing "uncertainty as to the true state of [even one] material fact, the procedural weapon of summary judgment is inappropriate." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

Nonetheless, summary judgment should be granted where no reasonable trier of fact could find in favor of the non-moving party. *H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989).

For the sake of clarity, the following analysis will deal with each of Helmer's causes of action grouped according to the underlying claim. For those causes of action which appear in more than one of these groups, the analyses represent alternative grounds for granting summary judgment in the defendants' favor.

*2. The Defendants' Activities Did Not Constitute Suppression of Dissent.*

The Second, Eleventh, Eighteenth and Thirty–Sixth causes of action assert that the defendants violated § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), in that they acted with the purpose of suppressing dissent among the members of the Local. A claim of this type is judged under the standard of *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), as refined by *Cotter v. Owens*, 753 F.2d 223 (2d Cir. 1985). *Finnegan* established the fundamental principle that disciplinary action against union officials or employees in their capacity as officials or employees, rather than as members, does not necessarily constitute a violation of the LMRDA. 456 U.S. at 441–42, 102 S.Ct. at 1873. In *Cotter*, the Second Circuit recognized a limitation on this broad grant of discretion where the challenged action was "part of a series of oppressive acts by the union leadership that directly threaten[ed] the freedom of members to speak out. In that unusual circumstance, which would require 'clear and convincing proof,'" relief under the LMRDA might be available. 753 F.2d at 229 (quoting *Newman v. Local 1101, CWA*, 570 F.2d 439, 445 (2d Cir.1978)).

■ Helmer has not presented evidence to establish that the defendants' acts were intended to suppress dissent among the membership of the Local. There was no

impending political campaign at the time that Helmer was removed, and he was not the leader of any identifiable dissident faction among the membership. Indeed, his recent leadership of an unsuccessful effort to oust Cotter from office—supported by an overwhelming majority of the Executive Board but soundly defeated by the members—suggests that the action against him was, if anything, no more than "an isolated act of retaliation for political disloyalty," *Cotter*, 753 F.2d at 230, rather than "part of a 'purposeful and deliberate attempt to suppress dissent within the union.'" *Id.* (quoting *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973)).

Therefore, summary judgment in the defendants' favor is granted on the Second, Eleventh, Eighteenth, and Thirty–Sixth causes of action.

*3. The Defendants Did Not Violate Helmer's Free Speech Rights.*

Helmer's First, Seventh, Seventeenth, Twenty–Third, Twenty–Eighth, and Thirty–Second [2] causes of action assert that the defendants violated his right to free speech under § 101(a)(2) by retaliating against him both for cooperating with the corruption investigation and for his filing of charges against Cotter. These claims are based primarily on *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), in which the Supreme Court found an exception to *Finnegan* where an elected official of a local union was discharged in retaliation for having campaigned against a proposition supported by the local's leaders.

The parties here have spent a good deal of time and energy arguing whether Helmer was an elected or appointed official of the Local, and thus whether or not the protection of *Sheet Metal Workers'* is available to him. On this issue, Helmer has the better of the argument. Although it is true that he attained his position by appointment, when Joy moved to the presidency of the National Union, the question of whether an office is elective or appoin-

tive must depend on the office itself, not the individual occupying that office. The defendants do not dispute that the usual method of selecting a Business Manager is by an election, or that the usual method of removing a Business Manager is also by election. The office must therefore be considered to be elective, and Helmer must be deemed to have been an elected official at the time of the events in question. Unfortunately, this conclusion does not help Helmer much, because he has not adduced evidence to prove that the defendants' behavior was retaliatory as required by *Sheet Metal Workers'*.

Helmer's first claim is that he was retaliated against for cooperating with the corruption investigation. However, it is not even clear whether his cooperation had begun prior to the time the charges were filed against him. Although he has submitted an affidavit stating that he first contacted the authorities several weeks before the charges were filed on October 3, 1988, this testimony contradicts his own earlier deposition testimony that he first became involved in the investigation in early October. Furthermore, regardless of when the actual cooperation began, Helmer has offered no evidence that any of the defendants were aware of his involvement. Of course, they could not have retaliated against him for activities of which they were not even aware.

More importantly, Helmer's communications with the authorities are not the type of expression protected by the LMRDA. The free speech provisions of that act are designed to protect speech in the context of the union democratic process, i.e. political speech primarily addressed to other union members, rather than free speech at large. "In providing such protection, Congress sought to further the basic objective of the LMRDA: 'ensuring that unions [are] democratically governed and responsive to the will of their memberships.'" *Sheet Metal Workers'*, 488 U.S. at 352, 109 S.Ct. at 643 (quoting *Finnegan*, 456 U.S. at 436, 102 S.Ct. at 1870). Helmer's claim is not that he was punished for relating his views on

---

**2.** The Thirty–Second cause of action appears to duplicate the Twenty–Third cause of action.

corruption to the members, but rather for cooperating with the authorities. No evidence has been presented here that he ever voiced his belief in the corruption of the Local's leaders to his fellow members. Particularly in light of the fact that the investigation ultimately went nowhere—suggesting that there was little for the union management to fear in the first place—Helmer's claim of retaliation for his cooperation with the authorities cannot stand.

As for the claim that his removal from office was retaliation for his own campaign against Cotter, Helmer's argument relies primarily on the fact that one of the charges against him—the fifth one listed above—was explicitly based on his having brought charges against Cotter. Assuming for the present purposes that § 101(a)(2) protects a union member's right to bring disciplinary charges against a fellow member,[3] this particular charge against Helmer was based not simply on his filing of charges as a union member, but rather on his actions as an officer attacking a fellow officer. Helmer's charges against Cotter not only divided the Executive Board, but also led the members to rebel against the Board's recommendation that Cotter be removed, further exacerbating the divisive conditions in the Local. While Helmer is correct that his office did not grant him any special authority to bring charges, and that therefore the charges against Cotter were brought merely in his capacity as a member, his position did bring with it increased responsibility.

> [W]hen a member assumes a union office, the office can imbue the member's speech with additional significance. Depending on the content of the speech and the nature of the office, the officer's speech may either advance her duties of office or interfere with these duties.... In addition, officers with broad policy-making or policy enforcing powers may be considered to be 'speaking for the union' on most any issue relevant to union policy. If the court determines that an officer could reasonably be perceived

> as speaking for the union, if her speech affects performance of her specific duties, the protections of [§ 101(a)(2)] for membership speech do not apply.

*Dolan v. Transport Workers Union,* 746 F.2d 733, 742 (11th Cir.1984).

Helmer has not presented evidence to establish that the actions against him were undertaken as retaliation for his exercise of rights protected by § 101(a)(2). Therefore, summary judgment is appropriate on Helmer's retaliation claims.

*4. The Plaintiffs Have Not Shown a Denial of Their Rights of Equal Participation.*

In his Sixth, Tenth, Twenty–Second, Twenty–Fourth, Twenty–Ninth and Thirty–Fifth causes of action, Helmer asserts that the defendants violated the plaintiffs' rights to participate equally in the democratic process of the union, guaranteed by § 101(a)(1) of the LMRDA. As the Supreme Court has held, this section "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Calhoon v. Harvey,* 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964). Also, "§ 101(a)(1) provides that where the members elsewhere have been given the right to vote on an issue, the union may not unreasonably discriminate against members in their exercise of that vote." *Johnson v. Kay,* 742 F.Supp. 822, 827 (S.D.N.Y.1990).

■ Helmer's Sixth, Tenth and Twenty–Ninth claims simply do not relate to any nominating or voting by the Local's members, but rather to Helmer's pressing of charges against Cotter (the Sixth cause), the refusal to process Helmer's charges against Briody (the Tenth cause), and the Local's refusal to press Helmer's grievance against Con Ed (the Twenty–Ninth cause). Therefore, under *Calhoon,* none of these causes can state a claim under § 101(a)(1).

---

**3.** This proposition is arguable: although the statute protects members' right to express their "views, arguments, or opinions," it does not

clearly indicate that members have a "right" to instigate union disciplinary action.

■ The Twenty–Second and Thirty–Fifth claims assert § 101(a)(1) violations with respect to the November 9 and September 20 meetings, respectively. The Thirty–Fifth claim is based on Briody's nomination of new Business Agents and other officers at the September 20 meeting following the membership's vote to keep Cotter in office. In brief, Helmer argues that the nomination of appointees and their ratification by the members was "fixed," in that: (1) the nominations were not made at the "usual" time, following the Business Manager's report; (2) the nominations were made late in the evening, after many of the members had left; and (3) the public address system was not working, so that any opposition to the appointees was not heard by the members.

■ With regard to the first two grounds, the By–Laws give the President the right to nominate officers to fill vacancies, with no restriction on when or how those nominations must be made. While it might have been undesirable from Helmer's point of view for Briody to have waited until late in the meeting to make these appointments, it simply cannot be said that the timing of the nominations, however strategic, constituted discrimination against anyone. As for the public address system, Helmer does not allege that Briody was able to address the members but that Helmer and his supporters were prevented from doing so, but rather claims that no one was able to use the system, with the result that "[t]he great majority of those present were not even aware that a vote was being held." Amended Complaint ¶ 62. Again, while it is unfortunate for Helmer that his supporters may not have been paying close enough attention to the proceedings to detect what was going on, his allegation is simply not enough to support a claim of discrimination in the voting process.

■ In the Twenty–Second cause of action, Helmer criticizes the membership vote at the November 9 meeting on the charges against him, principally on the grounds that the ballots distributed for the vote were "unduly complicated and difficult to understand," and that the form of the ballot made it much easier for voters to adopt the Committee's entire report than to disagree with portions of it. Amended Complaint ¶¶ 33–34. However, except in an extreme case, the mere fact that the format of a ballot might make certain votes easier than others is not enough to make out discrimination in the voting process. Helmer's complaint amounts to nothing more than a claim that voters who might otherwise have supported him were not attentive enough or motivated enough to pay attention to their ballots. As this is insufficient to establish discrimination against any voters or class of voters, Helmer's 101(a)(1) claim here must fail.

### 5. The § 609 Claims Are Unsupported.

■ In his Eighth, Twentieth, and Twenty–Fifth causes of action, Helmer challenges the defendants' activities as retaliatory in violation of § 609 of the LMRDA, 29 U.S.C. § 529. That section provides:

> It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act.

Helmer's Eighth and Twentieth claims assert retaliation in the filing of the charges against him and his conviction and removal from office, while the Twenty–Fifth claim relates to the subsequent denial of his membership rights after Con Ed refused to rehire him. In *Finnegan, supra,* the Supreme Court held that "the term 'discipline,' as used in § 609, refers only to retaliatory actions that affect a union member's rights or status *as a member of the union.*" 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis in original). Because the filing of charges against Helmer and his conviction on those charges affected only his status as an officer of the Local, *Finnegan* clearly implies that they

cannot form the basis of a § 609 claim.[4] As for the Local's refusal to treat him as a member following his attempt to return to Con Ed, as discussed *infra*, Helmer has not adduced any evidence suggesting that the Local had any alternative but to terminate his membership once he was not an officer of the local or an employee of the company.

### 6. The § 101(a)(5) Claim Cannot Stand.

■ Similarly, Helmer's Nineteenth claim, that his conviction and removal from office violated § 101(a)(5) of the LMRDA, is foreclosed by *Finnegan*. "[Section 101(a)(5)'s] 'prohibition on suspension without observing certain safeguards applies only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union.*'" 456 U.S. at 438, 102 S.Ct. at 1871 (quoting H.R.Conf.Rep. No. 1147, 86th Cong., 1st Sess., 31 (1959)) (emphasis in *Finnegan*).

### 7. The Local Did Not Violate Helmer's Right to Fair Representation.

■ Helmer's Thirtieth cause of action asserts that the defendants improperly refused to press his grievance against Con Ed, thereby violating the union's duty of fair representation. The defendants' earlier motion for summary judgment on this claim was denied based on the statement that "there are two issues which Briody and the other defendants must establish, that there is no factual conflict with respect to the Local's exercise of its discretion and that there is no merit to Helmer's grievance." *Helmer I*, 721 F.Supp. at 504 (S.D.N.Y.1989). This conclusion was rooted in the Supreme Court's explanation the duty of fair representation:

A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.... [A] union may not arbitrarily ignore a *meri-*

*torious grievance* or process it in a perfunctory fashion....

*Vaca v. Sipes*, 386 U.S. 171, 190–91, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967) (emphasis added). This explanation clearly implies that a refusal to process a grievance which has no merit cannot constitute a breach of the duty of fair representation. Thus although *Helmer I* spoke in terms of two issues which Briody needed to prove, in fact the intervening grant of summary judgment in Con Ed's favor in *Helmer II* is enough to establish that the grievance was not meritorious and that the Local's refusal to press it on Helmer's behalf was appropriate.

### 8. Helmer Never Properly Filed Charges Against Briody.

■ Helmer's Ninth, Tenth, and Eleventh causes of action assert that the Local's refusal to process his charges against Briody was improper. However, Helmer has not shown that he properly complied with the rules for filing such charges. Sanchez returned Helmer's purported charges to him and requested that they be dated and expanded to include more detail, but Helmer never resubmitted them. Because Helmer has failed to show that he complied with these requests, summary judgment must be granted on these causes of action.

### 9. Helmer Has Not Supported His Claims for Denial of Membership Rights.

■ The Twenty–Third, Twenty–Fourth, Twenty–Fifth, Twenty–Sixth, Twenty–Seventh, Thirty–First, and Thirty–Third causes of action all relate to the Local's refusal to treat Helmer as a member after he was removed from office and lost his subsequent battle with Con Ed to return to his position there. However, as mentioned above, Helmer has presented no evidence that the Local had any choice but to terminate his membership once he was not employed by the union or the utility.

---

**4.** In this regard, although Helmer's removal from office did ultimately lead to his expulsion from the Local, the proximate cause of that expulsion was the fact that he was not rehired by Con Ed following the termination of his

union employment. Thus his LMRDA rights are not implicated by the removal. The defendants had no control over the company's decision not to return Helmer to his former position. *See Helmer I*, 721 F.Supp. at 505.

Based on the decision in *Helmer II* that Con Ed was justified in refusing to rehire Helmer to his prior position, Helmer has failed to create a factual dispute concerning the propriety of the Local's actions in denying his membership rights. Therefore, summary judgment is appropriate on these claims.

### 10. The State Law Claims Are Dismissed for Lack of Jurisdiction.

 Fourteen of Helmer's causes of action state claims for violations of the Local's bylaws and the constitution of the UWUA. The LMRDA does not confer independent federal jurisdiction over these claims. *Adams–Lundy v. Association of Professional Flight Attendants*, 792 F.2d 1368, 1373 (5th Cir.1986); *Martire v. Laborers' Local Union*, 410 F.2d 32, 36 (3d Cir.1969); *Navarro v. Gannon*, 385 F.2d 512, 516 n. 6 (2d Cir.1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968). Because summary judgment is granted in the defendants' favor on all of the federal causes of action and to the extent that these state law claims are not covered in the preceding sections, the claims will be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment will be granted with respect to Helmer's First, Second, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty–Second, Twenty–Third, Twenty–Fourth, Twenty–Fifth, Twenty–Sixth, Twenty–Seventh, Twenty–Eighth, Twenty–Ninth, Thirtieth, Thirty–First, Thirty–Second, Thirty–Third, Thirty–Fifth, and Thirty–Sixth causes of action. The remaining claims are dismissed for lack of subject matter jurisdiction.

It is so ordered.