**Sondra F. MESSINA, Plaintiff,**

v.

**LOCAL 1199 SEIU, NATIONAL HEALTH & HUMAN SERVICE EMPLOYEES UNION, AFL–CIO; Dennis Rivera, in his personal and official capacity as President and all successors in interest; Steve Kramer, in his personal and official capacity as an Executive Vice President and all successors in interest; and Phyllis Mushkin, in her personal and official capacity as a Vice President and all successors in interest, Defendants.**

**No. 00 Civ. 7375(NRB).**

United States District Court,
S.D. New York.

Feb. 14, 2002.

<hr/>

Robert N. Felix, New York, NY, for plaintiff.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff, Sondra F. Messina ("Messina") brings this action against Local 1199 SEIU, National Health & Human Service Employees Union, AFL–CIO ("Local 1199") and certain of its officers pursuant to the Labor–Management Reporting and Disclosure Act ("LMRDA"), Sections 101(a)(2) and (5), 29 U.S.C. § 411(a)(2) and (5), and Section 609, 29 U.S.C. § 529, and under the Labor Management Relations Act ("LMRA"), Section 301, 29 U.S.C. § 185. Currently before the Court is defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and for summary judgment under Rule 56. For the reasons discussed below, defendants' motion is granted in part and denied in part.

### BACKGROUND

Local 1199, an affiliate of the Service Employees International Union, AFL–CIO, CLC ("SEIU") with over 200,000 members, represents a wide spectrum of health care workers employed at hospitals, medical centers, drug stores, and other such institutions. *See* Am. Compl. ¶¶ 15, 19. Defendants Dennis Rivera ("Rivera"), Steve Kramer ("Kramer"), and Phyllis Mushkin ("Mushkin") are respectively the elected President, Executive Vice President, and a Vice President of Local 1199. *See id.* ¶¶ 16–19. Plaintiff Messina has been a member of Local 1199 for over thirty years, during which time she has been employed as a Laboratory Technologist in the Biochemistry/Toxicology Department of Long Island Jewish Medical Center ("LIJ"). *See id.* ¶¶ 14, 23.

Plaintiff is a former Local 1199 organizer, and since her first election as a delegate in 1980 has alternated between roles as an elected delegate and as a union

organizer. *See id.* ¶¶ 24, 25. The role of a delegate is to execute Local and Division decisions, enforce the applicable collective bargaining agreement on behalf of represented members, attend all regular and special meetings of the Division and General Delegate's Assembly, and represent members at grievance meetings. *See id.* ¶¶ 26–30. Delegates furthermore pledge "to faithfully carry out the obligations of [their] office and secure for the members they represent every right and privilege of union membership." *Id.* ¶ 30 (citing Local 1199 Constitution, Article IV).

Plaintiff's account of her conflict with the union leadership begins around March 20, 1998, when plaintiff submitted a letter for publication to the attention of Dan North ("North"), then the Assistant Editor of Local 1199's newspaper, *1199 News. See id.* ¶ 35. The five paragraph letter was entitled "An Open Letter to Dennis Rivera," contained the signatures of plaintiff and around 70 union members, and strongly criticized the union representatives as being dishonest, "cozy with the bosses," unresponsive to grievances by union membership, "abusive and divisive," and for perpetuating a monarchy in union leadership. *Id.* ¶ 37 (reprinting plaintiff's letter). Several months later, North wrote plaintiff, notifying her that the March letter would be reprinted in the *1199 News* in an edited form. *See id.* at ¶ 38. North explained that the cuts were made both to shorten the length of the letter and to eliminate attacks on individuals. Specifically, North wrote,

> "While ... *1199 News* is an appropriate place for criticism of the union, it has never been a place for attacks on individuals in the union. Debate over policy is good, but I think the important issues tend to get lost when letters start down the road of personal attack. With that in mind, I took out all the names and all the charges against individuals.
>
> I think the letter as edited still makes your point."[1]

*Id.* The edited letter was published in the May–June 1998 edition, concurrent with the publication of a letter from another LIJ union member praising the union leadership. Plaintiff alleges on information and belief that this "rebuttal letter" was unedited and that it used two inches more space than plaintiff's letter. *See id.* ¶ 42–43. Further, plaintiff claims that the edited version of her letter changed the tenor of the original letter and watered down the content-based criticisms of union leadership contained in the original, thereby infringing plaintiff's and other members' free speech rights.[2] *See id.* ¶ 40.

1. North also noted that plaintiff's letter had been sent in its original form to Rivera.

2. The text of plaintiff's letter as written and as printed appears in paragraphs 37 and 39 respectively of plaintiff's amended complaint. The text of the letter as printed was:

 There is an extremely serious problem at Long Island Medical Center. The delegate body is shrinking. There are only delegate meetings and chapter meetings called when there is a very big problem. Few problems are solved at LIJ. Few grievances are scheduled for hearings, and since Human Resources always asks for an extension for the answer, the answers get lost over time or are never forthcoming. The organizers rarely follow-up. The union lets management do what they want to do.

 Full timers are getting laid off without following the supplemental layoff agreement that we have at LIJ and management is replacing persons with per diems and agency persons. Management chooses who they will layoff without regard to seniority. The Delegates' only recourse is to go to the NLRB when their rights are violated, and then the Union will finally file a grievance, long after the hospital has done its dirty work. The Union is always telling us: "we can't win this"—and we don't. Rare demonstrations accomplish nothing.

Plaintiff alleges that on a number of occasions subsequent to the publication of her letter, and with the knowledge of Kramer and Rivera, defendant Mushkin denied the plaintiff the right to attend meetings of her department and threatened to remove plaintiff as a delegate. *See id.* ¶¶ 33–34. In May of 1998, Mushkin sent plaintiff a letter stating that the union had received charges against her and that the Hearing and Appeals Board at LIJ had recommended plaintiff's suspension as a union delegate pending the outcome of such charges. *See id.* ¶ 44. Plaintiff maintains that no such charges were ever brought and that the allegations in Mushkin's letter were fabricated. *See id.* ¶ 46. Furthermore, plaintiff claims that when she herself brought a complaint pursuant to the union's Constitution against Mushkin for multiple charges relating to such behavior by Mushkin and Mushkin's treatment of members generally, defendant Rivera failed to process the charges brought by plaintiff. *See id.* ¶¶ 47–48.

Again, in August of 1998, Mushkin sent plaintiff a letter, this time notifying her that she had been brought up on charges and was required to attend a hearing. Claiming that this letter failed to meet the requirements imposed by the union's Constitution that complaints include certain information, including the name of the member bringing the charges as well as the specific charges being brought, *see id.* ¶¶ 51–55, plaintiff responded to this notice with a letter of her own, addressed to Mushkin and copying Rivera and the Board, attacking the adequacy of the hearing notice. Thereafter, plaintiff received a letter from the Hearing and Appeals Board stating that the Board had met three times after first notifying the plaintiff and giving her an opportunity to attend, and that the Board had decided to indefinitely drop plaintiff from the delegate rolls. Plaintiff alleges that she received no notice at all of these two other meetings. *See id.* ¶ 61. On October 14, plaintiff again responded by letter, this time to the Board, explaining that she had not been notified of two of the hearings and that the notice she did receive of one hearing was inadequate. *See id.* ¶ 61.

In January of 1999, plaintiff learned that Mushkin filed a "dropped delegate" form with persons in charge of delegate records. She spoke with Dawna Fennell ("Fennell"), Delegates Secretary, who told her that she still believed Messina to be a delegate. *See id.* ¶ 63. Subsequently, plaintiff continued to function as a dele-

---

The following passages were contained in the plaintiff's original letter, but not printed by the newspaper:

> We are suffering from a complete lack of honesty from our representatives. The democratic ideals of 1199 do not exist at LIJ. What exists is a monarchy. We members are afraid to disagree with these Union representatives, because we fear the resulting denigration and isolation from our fellow workers and Delegates. We also fear repercussion from management, as these persons are very cozy with the bosses. In the climate of LIJ these days, this could mean the loss of our jobs.
> [Those persons responsible for calling meetings] do not return calls or answer letters.

> They do not act on problems as they occur. They let them fester for years.
> ... Vps at the Union don't follow-up either. These Union representatives are abusive and divisive. They pit one member against another and at the same time are loudly preaching "solidarity" and telling us that there should be no infighting among ourselves. They only show favoritism to those members that support them.
> We are tired of this Kay, Kramer, and Mushkin brand of "solidarity". We would be better off without them then [sic] with them. Have you forgotten, Dennis, that we are the Union and that we, the members, sent you there?

gate, attending multiple meetings in May and June of 1999. *See id.* ¶¶ 66–71.

At a June 8 meeting at which plaintiff and several other delegates again raised the issue of members' open grievances, the clash over plaintiff's status as a delegate came to a head. At this meeting, Mushkin and Kramer both pronounced that plaintiff was not in fact a delegate. *See id.* ¶¶ 71–72. When plaintiff later tried to contact Local 1199's counsel to discuss these matters, her letter and phone calls went unanswered. *See id.* ¶¶ 73–75. This situation became still more confusing when, in November of 1999, plaintiff received word from Fennell that she was being entered into the system as a delegate. *See id.* ¶ 76. However, in January of 2000, after plaintiff was invited by form letter invitations to attend several delegate meetings, she received a letter from the union notifying her of the error and revoking these invitations on grounds that she was no longer a delegate. *See id.* ¶ 77–83. Messina submitted numerous letters and petitions around this time to Local 1199 and to the SEIU asking to attend these meetings and to be reinstated as a delegate. *See id.* ¶¶ 81, 85. After seeking this remedy at the union level, plaintiff filed this lawsuit in September of 2000.

## DISCUSSION

Plaintiff's complaint asserts eight claims for relief. Plaintiff's first claim asserts that her removal as an elected delegate was in reprisal for her zealous representation of union membership, assertion of free speech rights, and for bringing charges against an elected vice-president, and violated plaintiff's Title I rights as a union member and delegate under § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2). Similarly, claim six asserts that defendants' course of conduct is part of a purposeful and deliberate attempt to suppress opposi-

tion to and dissent from their actions and views within Local 1199, and to inhibit free assembly, also in violation of § 101(a)(2). In claim two, plaintiff asserts that the publication of plaintiff's March letter in the *1199 News* in its edited form constitutes a censure, and is an independent violation of plaintiff's free speech rights under Section 101(a)(2). Claim three alleges a violation of § 609 of the LMRDA, 29 U.S.C. § 529, on the theory that the retaliatory removal of plaintiff as an elected delegate for exercise of Title I rights constitutes unlawful "discipline." Building on claim three, claim four asserts that the imposition of such "discipline" taken without due process, after a "sham" hearing, and without affording plaintiff the opportunity to prepare a defense, violates § 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5). Claim five asserts that the three individual defendants should be held jointly and severally liable under § 102 for deprivations of plaintiff's rights under § 101. Claim seven asserts a cause of action under § 301 of the LMRA, 29 U.S.C. § 185, against Local 1199 only, alleging a breach of contract with respect to the provisions of the Local 1199 and SEIU constitutions that were violated when plaintiff was wrongly removed as an elected delegate. Finally, the eighth claim for relief asserts a claim against Local 1199 alone for breach of contract with respect to the constitutions of Local 1199 and SEIU for wrongly removing plaintiff as an elected delegate under New York State law.

Defendants move to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants further argue that as far as plaintiff's seventh claim is based on alleged violations of plaintiff's contractual rights under the Local 1199 and SEIU constitutions, Local 1199 is not governed by the SEIU constitution in connection with disciplinary matters, and as the LMRA is applicable only

to breaches of international constitutions, such a claim under the LMRA may also be dismissed pursuant to Federal Rule of Civil Procedure 56.

## A. Standard of Review under Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), we are required to accept as true the factual assertions in the complaint and to construe all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Charles W. v. Maul,* 214 F.3d 350, 356 (2d Cir.2000). In addition, we may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996).

## B. Section 101(a)(2) of the LMRDA

 Contained in Title I of the LMRDA, Section 101(a)(2) is part of the "Bill of Rights of Members of Labor Organizations." Entitled "Freedom of Speech and Assembly," § 101(a)(2) provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings. *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and en-

force reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2). The purpose of Title I, as evidenced by its legislative history, was to protect union members from oppressive union leadership while preserving the union's right to adopt reasonable rules of governance. *See United Steelworkers of America, AFL–CIO–CLC v. Sadlowski,* 457 U.S. 102, 108–10, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982) (describing legislative history). The Supreme Court has held that while Title I was intended to restate the First Amendment value of the right to "speak one's mind without fear of reprisal", Congress's decision to include a proviso covering "reasonable" rules refutes the proposition that Title I's protection is coextensive with that of the First Amendment. *Id.* at 111, 102 S.Ct. 2339. Further, courts should act with caution when considering whether to intervene in union disputes given a well-established policy against government interference in internal union management. *See Cotter v. Owens,* 753 F.2d 223, 226 (2d Cir.1985); *Commer v. Keller,* 64 F.Supp.2d 266, 270 (S.D.N.Y.1999).

Plaintiff's claims under § 101(a)(2) can be loosely grouped in two categories. First, in her first and sixth claims, plaintiff alleges that her Title I rights were violated by the various circumstances surrounding her removal from elected office as a delegate, giving rise to a cause of action under § 102.[3] Second, plaintiff claims that the publication of her March letter in the *1199 News* in a censured form also violates

---

**3.** Section 102, 29 U.S.C. § 412, provides in relevant part that, "[a]ny person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

§ 101(a)(2), giving rise to plaintiff's second claim for relief under § 102. Defendants have argued that plaintiff's claims for relief under § 101(a)(2) all fail to state a claim as a matter of law under Federal Rule of Civil Procedure 12(b)(6). We take each category of plaintiff's allegations in turn.

### 1. Plaintiff's First and Sixth Claims for Relief

Plaintiff's first claim for relief alleges that the LMRDA protects both members and elected delegates against reprisals for exercising Title I rights, and that "[a]s plaintiff was removed as an elected delegate for representing union members zealously, for engaging in free speech, [and] for attempting to bring charges against an elected vice-president, such action infringes on protected rights." Claim six asserts that defendants course of conduct is part of a purposeful and deliberate attempt to suppress opposition to and dissent from their actions and views by the membership within Local 1199 in violation of § 101(a)(2).

The Supreme Court first discussed the threshold question of whether removal from union office could constitute a violation of Title I in *Finnegan v. Leu,* 456 U.S. 431, 440–41, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), in which the Court held that the discharge of a union's appointed business agents by the union president, following his election over the candidate supported by the business agents, did not violate § 101(a)(2). The Court ultimately concluded that in passing Title I, Congress could not have meant to "restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own," *id.,* but more generally expressed doubt that the Title I protections of membership rights extended beyond "rank-and-file union members" to union officers or employees. *Id.* at 436–37, 102 S.Ct. 1867. The Court specifically left open the question of "whether the retaliatory discharge of a union member from union office ... might ever give rise to a cause of action under § 102." *Id.* at 440–41, 102 S.Ct. 1867.[4]

Subsequently, in *Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989) (hereinafter *"Lynn"*), the Supreme Court directly addressed whether the protections of § 101(a)(2) could extend to the retaliatory removal of an elected union officer from union office. In that case, the Court held that the removal of an elected business agent, in retaliation for statements made at a union meeting in opposition to a dues increase, violated § 101(a)(2). The Court distinguished the facts from those in *Finnegan* on several grounds, all related to the basic objective of the LMRDA "to ensure that unions are democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Id.* at 354, 109 S.Ct. 639. For one, the retaliatory removal of an elected official denies union members the representative of their choice. *See id.* at 355, 109 S.Ct. 639. Further, the discharge of an elected official not only chills the official's own free speech rights, but sends a message to those members who voted for him that the

---

**4.** The Court also left open the question of whether its holding permitting the discharge of business agents might be different in a case involving nonpolicymaking and nonconfidential employees. *Id.* at 441, n. 11, 102 S.Ct. 1867; *see also id.* at 442, 102 S.Ct. 1867 (Blackmun, J., concurring) (joining majority's opinion only on the understanding that "the Court ... is not reaching out further to decide the same issue with respect to nonpolicymaking employees").

union hierarchy can be challenged only "at one's peril." *Id.*

▇ Furthermore, under the rationale articulated in *Cotter v. Owens,* 753 F.2d 223 (2d Cir.1985), the Second Circuit has long recognized that the removal of an official from union office may violate the membership protections of § 101(a)(2) where the challenged action is part of "a purposeful and deliberate attempt to suppress dissent within the union." [5] *Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir. 1973) (establishing this doctrine); *see also Cotter,* 753 F.2d at 229 (citing *Schonfeld* ); *Kirrane v. Transport Workers Union of America,* 781 F.Supp. 1044 (S.D.N.Y.1992) (explaining *Lynn* and *Cotter* as exceptions to *Finnegan'* s general rule that removal from union office is not protected under Title I). As plaintiff's complaint successfully pleads causes of action for a violation of § 101(a)(2) under the rationales of both *Lynn* as well as *Cotter,* defendants' motion to dismiss plaintiff's first and sixth claims for relief is denied.

**a. Plaintiff's first claim for relief meets the standard established by Lynn.**

▇ Plaintiff maintains that her first claim for relief states a claim as a matter of law under *Lynn.* In their motion to dismiss, defendants first argue that plaintiff's amended complaint does not specifically allege retaliatory action as required by *Lynn.*[6] We disagree with defendants' contention. The factual basis for plaintiff's first claim for relief is as follows. Plaintiff, an elected union delegate, sent a letter to the *1199 News* signed by her and seventy other members. The letter criticized the integrity and performance of union leaders, specifically attacking their lack of responsiveness to members' grievances and their poor representation of members to management. Plaintiff also spoke with union leaders at several meetings about complaints of similar substance to those contained in her printed letter. Plaintiff claims that as reprisal for engaging in this speech, she was advised on several occasions that she was being brought up on unspecified charges through sham procedures and was ultimately dropped as a delegate. Contrary to defendants' argument, such allegations state specific facts going towards plaintiff's claim that she was retaliated against for exercising her Title I rights to free speech. The plaintiff is entitled to an opportunity through the discovery process to gather evidence that her removal as a delegate was an act of retaliation. *See Depperman v. Local 1199 Union,* No. 91 CV 6696, 1994 WL 225434 (S.D.N.Y. May 25, 1994) (explaining that § 101(a)(2) requires proof of a violation of membership rights through a showing that "the action was in retaliation for the officer's political speech which goes to the democratic integrity of the union"); *cf. Helmer v. Briody,* 759 F.Supp. 170 (S.D.N.Y.1991) (dismissing plaintiff's claim at the summary judgment stage for failure to produce evidence that defendants' behavior in removing an elected official was retaliatory as required by *Lynn* ).

▇ Defendants further argue that because the LMRDA protects union mem-

---

5. In reaching its conclusion in *Lynn,* the Supreme Court specifically rejected the contention that a union official must establish that his firing was part of a systematic effort to stifle dissent within the union to state a claim under § 102. *Lynn,* 488 U.S. at 355 n. 7, 109 S.Ct. 639.

6. Defendants further argue that plaintiff alleges no facts which would support her allegation that she was removed as a delegate for having filed charges against Mushkin, especially since plaintiff was initially told that she was being removed as a delegate before her charges against Mushkin were brought. *See* Defs.' Mot. to Dismiss at 6.

bers as members, and not as officers, plaintiff's first claim for relief should be dismissed for failure to allege a direct infringement of plaintiff's membership rights. For support, defendants rely on several cases that can be factually distinguished on grounds that the plaintiff in those cases had been removed from appointed office or union employment, and not elected office. *See Cotter v. Owens,* 753 F.2d 223 (2d Cir.1985) (plaintiff removed from appointed committee position); *Franza v. International Brotherhood of Teamsters,* 869 F.2d 41, 48 (2d Cir.1989) (specifically noting that plaintiff's removal from position as an appointed employee of a benefit plan distinguished the case from *Lynn*); *Maddalone v. Local 17, United Brotherhood of Carpenters and Joiners of America,* 152 F.3d 178 (2d Cir.1998) (where plaintiff was removed from appointed shop steward position in alleged attempt to suppress dissent within the union, *Cotter* exception was invoked and *Lynn* was not discussed). Defendants also mistakenly argue that because Messina had no right to have her views published in the union newspaper, her Title I free speech rights could not have been violated. To the contrary, although Messina did not have an absolute right to the publication of her views, as discussed in Part B.2 of this Opinion, once voluntarily published by the union, her views constitute "speech" deserving of Title I protections where applicable. *Cf. Caldwell v. International Longshoremen's Association Local 1694,* 696 F.Supp. 132 (D.Del.1988) (union member's statements in letter criticizing union leaders and published by union newspaper was protected by LMRDA provision against improper union disciplinary action).

Moreover, defendants' argument misses the significance of the Supreme Court's holding in *Lynn.* As in *Lynn,* plaintiff alleges removal from an *elected* position as a direct result of exercising her membership right to rally opposition to the union leadership and speak out freely against union officials. As plaintiff was an elected official, the removal of plaintiff as a delegate raises the concerns expressed in *Lynn* that the retaliatory removal of an elected official (as opposed to an appointed official) not only chills the free speech rights of the removed official as a member and as an official, but also deprives the membership of their choice for elective office and sends a message to members that they speak against the leadership only at their peril.[7] *See Lynn,* 488 U.S. at 355, 109 S.Ct. 639; *see also Pickering v. Beatty,* No. 90–CV–1076S, 1992 WL 225555, *5–7 (W.D.N.Y.1992) (discussing *Finnegan* and *Lynn*). Further, in this case, plaintiff was removed after the publication of a letter signed by seventy other members, a point which emphasizes *Lynn's* concern with the message sent by retaliatory action taken by union leaders. *Lynn,* 488 U.S. at 355, 109 S.Ct. 639 ("Seeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal, other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril.") Additionally, since the role of a delegate is, at least in part, to represent the general membership to the union leadership, retaliatory action taken against a delegate for criticizing the leadership could

---

7. Defendants' argue that Messina's subsequent re-election to her position as a Delegate belies the argument that Messina or the members she represents were "chilled" in their exercise of their rights as a result of plaintiff's earlier removal from office. *See Defs.' Reply Br. at 9, n. 12.* We find this argument unpersuasive, as plaintiff's re-election more pointedly emphasizes that the members were deprived of their chosen elected representative and that the members support the viewpoints that Messina espouses.

be interpreted by members as a direct message to them.

For all these reasons, we feel that plaintiff has pleaded facts that, if proven, would satisfy the *Finnegan/Lynn* framework for establishing a violation of § 101(a)(2) for removal from union office.

### b. *Plaintiff's sixth claim for relief states a claim under Cotter as action taken against a union official as part of a calculated attempt to suppress dissent within the union.*

■ In plaintiff's sixth claim for relief she alleges that defendants' course of conduct was part of a purposeful and deliberate attempt to suppress opposition to and dissent from their actions and views within Local 1199 in violation of § 101(a)(2). In *Cotter*, the Second Circuit recognized that a union official might become a symbol for a movement within the rank-and-file union membership, and that removal of such person could be considered threatening to the exercise of Title I rights by the membership generally. In these rare cases, the question is "whether an action against the official is merely an isolated act of retaliation for political disloyalty or is instead part of a purposeful and deliberate attempt to suppress dissent within the union." *Franza v. International Brotherhood of Teamsters*, 869 F.2d 41, 45 (2d Cir.1989). A cognizable Title I claim may be established only where a litigant shows by "clear and convincing proof" that dismissal was "part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out." *Cotter*, 753 F.2d at 229; *Maddalone*, 152 F.3d at 184; *Franza*, 869 F.2d at 45.

■ Defendants' principle argument in support of their motion to dismiss plain-

tiff's sixth claim is that plaintiff fails to allege that her removal was part of a union-wide campaign against dissent, as it is not alleged that action was taken against any other member or delegate or that plaintiff was the leader of a dissident faction. As plaintiff in her letter to the *1199 News* represented the views of at least the seventy signatories who also opposed the ways in which union leaders were carrying out their job responsibilities, plaintiff may certainly be characterized as the leader of a dissident faction.[8] Further, we are aware of no requirement that to establish a claim under *Cotter* for the removal from union office, the plaintiff must specifically allege that other union officers were also removed. Rather, the question is whether plaintiff has alleged a series of behaviors by defendants designed to suppress dissent.

■ Reading the complaint in the light most favorable to plaintiff, we conclude that plaintiff has alleged sufficient facts to state a claim under *Cotter* for the sustained actions of defendants in trying to silence her. From the time that plaintiff was first notified that she was suspended as a delegate in May of 1998, until the final notice of her removal was sent in January of 2000, plaintiff received multiple notices that she was being brought up on unspecified charges. Also during this approximately one and a half year period, during which plaintiff effectuated the publication of the critical letter in the *1199 News* and several times met with union leaders to discuss problems with a backlog of grievances, plaintiff alleges that defendants attempted to and/or succeeded in removing her as a delegate on several occasions. *See* Am. Compl. ¶¶ 66–71. Further, despite the repeated requests by plaintiff and the request of at least one

---

8. Further, when plaintiff was removed as a delegate, approximately two hundred mem-

bers petitioned defendant Rivera to re-instate plaintiff as a delegate. *See* Am. Compl. ¶ 85.

other member, plaintiff's complaints about Mushkin's allegedly improper conduct towards her and other members were ignored. *See* Am. Compl. ¶¶ 47–49. While defendants argue that plaintiffs' re-election to union office after being removed as a delegate only supports their assertion that dissent was not stifled and that "the democratic process is alive and well," plaintiff's re-election more specifically lends additional support to plaintiff's allegations that the membership supported her in her dissident activities. *Cf. Toner v. United Brotherhood of Carpenters,* No. 96 CV 0023 SHS RLE, 1999 WL 638602, *6 (S.D.N.Y. March 30, 1999) (dismissing plaintiffs' claims on summary judgment in part because plaintiffs failed to produce evidence that the membership voted for them because of their allegedly dissident views). Such allegations meet the threshold of "present[ing] sufficient evidence to preserve the issue whether [her] termination . . . was part of a calculated attempt to suppress dissenting views within the union." *Maddalone,* 152 F.3d at 185. Therefore, defendants' motion to dismiss plaintiff's sixth claim for relief is denied.

## 2. Plaintiff's Second Claim for Relief

With respect to plaintiff's assertion that her rights under § 101(a)(2) were violated by the edited publication of her letter in the *1199 News,* defendants argue that union members have no right to publish their views in their union's newspaper, and that the willingness of the editor to publish plaintiff's letter at all demonstrates "the depth of 1199's democratic tradition, and its willingness to tolerate dissent." Defs.' Mot. to Dismiss at 9. Furthermore, defendants argue that the publication of plaintiff's letter in its edited form was reason-

able, especially given that the letter as published remained highly critical of union leadership even while deleting the more personal attacks. *See id.* For the reasons that follow, we grant defendants' motion to dismiss plaintiff's second claim for relief.

▮▮▮ To determine whether a union rule is valid under the LMRDA, the Supreme Court has instructed that we must first ask whether the rule interferes with an interest protected by the first part of § 101(a)(2). *United Steelworkers of America, AFL–CIO–CLC v. Sadlowski,* 457 U.S. 102, 111, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982).[9] If it does, we must then determine whether the rule is "reasonable" and thus sheltered by the proviso to § 101(a)(2). *Id.* In applying this test, "the critical question is whether a rule that partially interferes with a protected interest is nevertheless reasonably related to the protection of the organization as an institution." *Id.* at 112, 102 S.Ct. 2339. In contrast to most cases in this area, plaintiff does not allege that Local 1199 totally denied her an opportunity to voice her criticisms with the leadership in the *1199 News.* Rather, she alleges that the alteration of her letter softened the tone and content-based criticisms contained in her letter, and thereby violated her free speech rights under § 101(a)(2).

▮▮ As a general rule, union members possess no right to the publication of their views in a union publication. *See Roman v. New York State United Teachers,* 655 F.Supp. 422 (S.D.N.Y.1987) (holding that the refusal of a union newspaper to publish plaintiffs' advertisement under a policy of refusing to publish all paid political advertisements did not violate § 101(a)(2), espe-

---

9. In *Sadlowski,* the Court held that while a union rule prohibiting non-members from contributing to union campaigns limited the ability of union insurgents to campaign effec-

tively for elected office, it was valid because it was "rationally related to the union's legitimate interest in reducing outsider interference in union affairs."

cially where the newspaper offered to print it as an editorial with one minor modification); *Members for a Democratic Union v. Local 1101, Communications Workers of America, AFL–CIO*, 697 F.Supp. 771 (S.D.N.Y.1988) (holding under the two-part test established in *Sadlowski* that the union's policy of refusing to print political articles and paid advertisements, when applied in an even-handed manner, did not violate § 101(a)(2)). However, under some Sixth Circuit case law relied on by plaintiff, Messina could sustain her second claim for relief by showing that the union newspaper "opened the forum" of its publication to the speech of its members by printing articles on the very issue the plaintiff sought to address, and then made a content-based restriction on plaintiff's proposed communication. *See Members for a Democratic Union*, 697 F.Supp. at 775–76; *Knox County Local v. National Rural Letter Carriers' Association*, 720 F.2d 936 (6th Cir.1984) (holding that upon opening newspaper as public forum, national union's refusal to publish local union's advertisement on content-based grounds violated § 101(a)(2)).

■ The question presented by defendants' motion, therefore, is whether the union opened up the forum of the newspaper to speech on the issue plaintiff sought to address, thereby creating an obligation on the part of the union to publish plaintiff's article as originally submitted. In passing § 101(a)(2), Congress surely did not intend to create a right, enforceable by the courts, of every union member to publish her views on union governance in the union newspaper. Under the Sixth Circuit case law relied on by plaintiff, only where a union is in control of a "protected, open, and exclusive forum of communication" and makes a content-based decision to deny access to those expressing one viewpoint while strongly supporting another

viewpoint, on an issue of importance to the union, has a plaintiff's right to publication been found to arise. *See, e.g., Knox County*, 720 F.2d at 937–41 (forcing union to publish opposition to union contract where newspaper had thrown support behind contract by publishing the contract itself and by urging its ratification). In this case, Messina has not alleged and does not argue that she was denied the opportunity to participate on one side of a debate where views of the other side of the debate were widely disseminated in the newspaper as an open forum to discuss the quality of union governance.

Thus, even under the rationale employed in the few cases where a member's right to publication has been established, Messina's second cause of action cannot stand as an independent violation of § 101(a)(2) under the first prong of *Sadlowski*. As plaintiff's second claim for relief fails to state a claim under § 101(a)(2), this Court lacks jurisdiction over this claim under § 102. *See Members for a Better Union v. Bevona*, 152 F.3d 58, 65 (2d Cir.1998) (dismissing for lack of jurisdiction under § 102 where complaint failed to state a viable claim under § 101(a)(1)). Accordingly, plaintiff's second claim for relief is dismissed.

## C. Section 609 and 101(a)(5) of the LMRDA

Plaintiff's third and fourth claims for relief allege that defendants' acts causing her removal as a union delegate in retaliation for exercising her Title I rights should be considered "discipline," in violation of §§ 609 and 101(a)(5). Sections 609 and 101(a)(5) guarantee due process-like procedural protections to members of labor unions. Section 609 of the LMRDA provides in relevant part that "[i]t shall be unlawful for any labor organization, or any officer ... thereof to fine, suspend, expel, or otherwise discipline any of its members for

exercising any right to which he is entitled under the provisions of this Act." 29 U.S.C. § 529. Section 101(a)(5) further ensures that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined" unless the disciplined member is "(A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." [10] 29 U.S.C. § 411(a)(5). The phrase "otherwise disciplin[e]" has the same meaning in both sections, *Finnegan*, 456 U.S. at 439 n. 9, 102 S.Ct. 1867, and § 102's enforcement provisions are applicable to both §§ 609 and 101(a)(5).

■ There is no question that if plaintiff were an appointed officer, her removal would not state a claim under §§ 609 or 101(a)(5) pursuant to *Finnegan*, in which the Court dismissed an appointed business agent's claim upon concluding that "discipline" "refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." 456 U.S. at 437, 102 S.Ct. 1867. It is equally clear that the kinds of retaliatory charges and sham proceedings alleged in plaintiff's complaint, if brought against a union member to suspend her membership, would constitute punishment authorized by the union as a collective entity, thereby meeting the definition of "discipline" established by the Supreme Court in *Breininger v. Sheet Metal Workers Int'l Assoc. Local Union No. 6*, 493 U.S. 67, 91–92, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). The question raised by defendant's motion, and which has not been addressed by either the Second Circuit or the Supreme Court, is whether "discipline" as used in these due process provisions of the LMRDA includes a member's removal from elected office in disregard of proper procedures.

*See Lynn*, 488 U.S. at 353 n. 5, 109 S.Ct. 639 (noting that plaintiff's § 609 claim was not before the Court). The courts in this district that have addressed this issue have answered the open question in the negative. *See Depperman v. Local 1199 Union*, No. 91 CV 6696 JFK, 1993 WL 36132, *4 (Feb. 10, 1993), *appeal denied*, 17 F.3d 1425 (2d Cir.1994) (holding that removal of Local 1199 delegate does not affect membership rights or status and dismissing claims under §§ 609 and 101(a)(5)); *Helmer v. Briody*, 759 F.Supp. 170, 178–79 (S.D.N.Y.1991) (similarly holding that *Finnegan* forecloses assertion of claims under §§ 609 and 101(a)(5) for removal of an elected business manager). *But see Duffy v. International Brotherhood of Electrical Workers*, 780 F.Supp. 1185, 1189 (N.D.Ill. 1991) (holding that the retaliatory removal of an elected officer constitutes "discipline" under § 609 as well as a free speech violation under § 101).

Admittedly, the question is a difficult one. However, we have concluded that a close reading of *Finnegan* and *Lynn* more strongly favors the conclusion that plaintiff has not stated a claim under §§ 609 and 101(a)(5). We read *Finnegan's* discussion of the due process provisions of the LMRDA as encompassing both appointed and elected officer removal cases. First, the Supreme Court's interpretation of the statutory language of § 609 seems equally applicable to suits for improper discipline by elected and appointed officers. The Court noted that, "[s]ection 609 speaks in terms of disciplining 'members'; and the three disciplinary sanctions specifically enumerated—fine, suspension, and expulsion—are all punitive actions taken against union members as members." *Finnegan*, 456 U.S. at 437–38 & n. 8, 102 S.Ct. 1867 (noting as well that in contrast to § 609,

---

**10.** The statute does make an exception, however, to allow members to be disciplined without the requisite process for failure to pay membership dues.

another provision of the LMRDA expressly considers procedures for removal of officers). Second, the Court reviewed the legislative history of the LMRDA, and found that Congress most likely did not intend to extend the procedural protections of the LMRDA to the status of members as officers of the union. *Finnegan*, 456 U.S. at 438, 102 S.Ct. 1867 (quoting the Conference Report discussing § 101(a)(5) that states, "the prohibition on suspension without observing certain safeguards applies only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union*" (emphasis added)).

Finally, we think that *Lynn's* rationale for extending the free speech protections of the LMRDA to the retaliatory removal of an elected officer is less compelling in the context of the LMRDA's procedural protections. As developed in *Lynn*, where an elected officer is removed in retaliation for an exercise of free speech rights, the overriding purpose of the LMRDA to ensure democracy in union governance is threatened—not only because members are deprived of their choice for elected office, but because the removal sends a message to the membership that the union hierarchy should not be challenged. However, when the improper removal from union office is not preceded by a free expression of speech, but simply fails to conform to the proper procedures, the democracy concerns articulated in *Lynn* are diminished because the message sent to members by the removal is not nearly as direct. Moreover, in this particular case, the factual bases for Messina's free speech and due process claims are essentially the same, and the evidence concerning the procedural aspects of her removal from office will be admitted in connection with

her § 101(a)(2) claim and full relief may be awarded under § 102.

For these reasons, defendant's motion to dismiss plaintiff's claims under §§ 609 and 101(a)(5) is granted.

## D. Section 301 of the LMRA

Plaintiff asserts her seventh claim for relief against Local 1199 only, under § 301 of the LMRA, 29 U.S.C. § 185, for breach of contract with respect to provisions of the Local 1199 and SEIU constitutions that were allegedly violated when plaintiff was wrongly brought up on charges and removed as an elected delegate. Section 301 confers federal subject matter jurisdiction over a suit brought by a union member for a violation of member rights created by "contracts between an employer and a labor organization . . . or between any such labor organizations." *Wooddell v. Int'l Brotherhood of Electrical Workers*, 502 U.S. 93, 98–102 & n. 3, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991); *Rodriguez v. IBT, AFL–CIO*, No. 98 CV 8849, 1999 WL 816182, *3 (S.D.N.Y. Oct. 13, 1999). Such contracts may include union constitutions, *see id.*, but not the constitutions of local unions, which are not contracts between labor organizations. *Rodriguez*, at *3 n. 3.; *Johnson*, 742 F.Supp. at 828 (specifically holding that "the Local 1199 Constitution is not a contract 'between labor organizations' within the meaning of § 301"). Therefore, to the extent that plaintiff's seventh claim for relief under § 301 is based on violations of the Local 1199 constitution, it is dismissed for lack of jurisdiction.

With respect to the part of plaintiff's seventh claim based on violations of the SEIU Constitution,[11] for which defendants concede § 301 grants federal jurisdiction,

---

11. Specifically, plaintiff alleges that defendants violated Article XVII of the SEIU Constitution, which requires that "charges be specific and in writing." *See* Am. Compl. ¶ 54.

defendants argue that plaintiff's claim should be dismissed under Rule 56. This argument is predicated on evidence submitted by defendants that pursuant to the Affiliation Agreement between the SEIU and Local 1199, discipline of members of Local 1199 was exempted from the provisions of the SEIU Constitution for a period of time including the time period at issue in plaintiff's complaint.[12] Based on this agreement and the affidavit of defendants' attorney declaring that there are no other documents or evidence relevant to the scope and effect of the agreement, defendants argue that plaintiff's claim under § 301 should be dismissed.[13] Plaintiff opposes defendant's motion for summary judgment on grounds that there has been no discovery yet in this action, arguing that she is without knowledge and information necessary to determine the "scope and effect" of the agreement. Plaintiff further moves under Rule 56(f), petitioning that the Court either refuse the judgment requested by defendants, or alternatively order a continuance to permit discovery on this question.

▆▆ Despite the compelling evidence offered by defendants that plaintiff may not be able to benefit from the protections of the SEIU Constitution under the Affiliation Agreement, it would be premature to grant summary judgment at this stage. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that Rule 56(f) provides that summary judgment be denied "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.") We therefore grant plaintiff's cross-motion for relief under Rule 56(f) and, accordingly, deny defendants' motion for summary judgment on this part of plaintiff's seventh claim without prejudice to its renewal after relevant discovery is taken.

In sum, defendants' motion to dismiss plaintiff's LMRA claim is granted to the extent plaintiff's claim is based on violations of the Local 1199 Constitution. With respect to the part of plaintiff's claim based on violations of the SEIU Constitution, plaintiff's cross motion under Rule 56(f) is granted and defendants' motion for summary judgment is denied.

### E. Plaintiff's Fifth and Eighth Claims for Relief

▆▆ Plaintiff's fifth claim for relief asserts that the individual defendants are jointly and separately liable under § 102

12. Specifically, the Partnership/Affiliation Agreement between Local 1199 and the SEIU states:

Until the expiration of a period of five (5) years from April 1, 1998, no grievances or charges which may result in sanctions or discipline may be brought under the provisions of the SEIU Constitution by or against any member or officer of [Local 1199] or by or against [Local 1199] itself, unless specifically provided elsewhere in this Agreement. Thereafter such grievances or charges may be brought and processed under the provisions of the SEIU Constitution.

Behroozi Aff., Ex. B. ¶ 53. The agreement was signed on November 16, 1999, appears to have taken effect on January 1, 2000, and the section at issue apparently intends to have retroactive effect back to April 1, 1998, the day that Local 1199 became affiliated with the SEIU.

13. Defendants submit as well the original Affiliation Agreement, which was superseded by the November 16, 1999 agreement, pointing out that the terms relevant to plaintiff's claim are identical. *See* Behroozi Reply Aff. ¶ 5, Ex. A.

for using union power to deprive plaintiff of her membership rights in violation of § 101. *See Johnson v. Kay*, 742 F.Supp. 822, 833–34 (S.D.N.Y.1990) ("A union officer may, in appropriate circumstances, be sued in his/her individual capacity for damages for acts undertaken in an official capacity."). Plaintiff's eighth claim for relief is based on state law contract violations of the SEIU and Local 1199 Constitutions. Anticipating the dismissal of plaintiff's claims for relief under § 101, defendants moved to dismiss plaintiff's fifth claim on grounds that no cause of action against union officers may lie under § 102 where Title I rights have not been violated. Similarly anticipating dismissal of all of plaintiff's federal causes of action, defendants move to dismiss plaintiff's state law claims for lack of federal jurisdiction.[14] As plaintiff's relevant claims have not been dismissed, defendants' motion to dismiss plaintiff's fifth and eighth claims for relief is denied.

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted in part and denied in part. A conference is scheduled in this matter for Monday, March 4, 2002, at 3:00 p.m.

**IT IS SO ORDERED.**

---

14. We note that § 301 of the LMRA preempts state law claims that are "inextricably intertwined with consideration of the terms of a labor contract." *Wall v. Constr. & Gen. Laborers' Union*, 224 F.3d 168, 178–79 (2d Cir.2000); *McKee v. Transco Products, Inc.*, 874 F.2d 83, (2d Cir.1989); *see also Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209–11, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (discussing the preemptive effect of § 301 and the policy behind this doctrine, including the negative effects of conflicting substantive interpretations under different legal systems). However, defendants have not made an argument for preemption, and given the absence of any discovery and therefore our limited information with respect to the terms of the contracts at issue, we decline to address the issue of preemption at this time.